### CHEEK v. NICHOLSON et al.

(Court of Civil Appeals of Texas. Nov. 26, 1910. On Motion for Rehearing, Jan. 5, 1911.)

1. APPEAL AND ERROR (§ 917*)—PRESUMPTIONS—RULING ON DEMURRER.

Where the record fails to show any ruling on a general demurrer, it will be presumed on appeal to have been either abandoned or overruled.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3706–3709; Dec. Dig. § 917.*]

2. TRIAL (§ 169*) — DIRECTION OF VERDICT — INSUFFICIENCY OF PLEADING—DEMURRER.

Where a general demurrer to the complaint is either abandoned or overruled, the trial court may not instruct a verdict for defendants on the ground of any imperfection in the complaint, thus cutting off plaintiff's right to amend.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 169.*]

3. BROKERS (§ 82*)—ACTION FOR COMMISSION—PLEADING.

In a broker's action for compensation for selling land, where the only cause of action shown by the evidence was one for the recovery of certain property which defendants agreed to give plaintiff for making the sale, or the recovery of the value thereof, and the petition showed that the consideration for the transfer was plaintiff's service, the fact that the further allegation that the property was to be transferred by defendants and accepted by plaintiff in lieu of an agreed commission of $3,000 was shown to be untrue did not defeat plaintiff's

right to recover the property or have a decree for specific performance.

[Ed. Note.—For other cases, see Brokers, Dec. Dig. § 82.*]

4. VENDOR AND PURCHASER (§ 3*)—CONTRACT OF SALE—OPTION.

An agreement by landowners to sell land to named parties for a certain sum, part payment of which was acknowledged, further agreeing to furnish abstracts of title, the vendees to have three days to examine the same and consummate the deal, was a binding contract of purchase and sale and not a mere option.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 3; Dec. Dig. § 3.*]

5. BROKERS (§ 60*)—SALE OF LAND—RIGHT TO COMMISSION.

Where a broker procured the execution of a contract for the sale of land and had earned his compensation, his right thereto could not be defeated by a subsequent agreement between his principal and the vendee to cancel the contract.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 91; Dec. Dig. § 60.*]

6. BROKERS (§ 61*)—SALE OF LAND—RIGHT TO COMMISSION.

When a broker procures a customer with whom his principal is willing to make and does make a binding contract of sale, which is not consummated because of defects in the title of which the broker was ignorant, he is nevertheless entitled to his commission.

[Ed. Note.—For other cases, see Brokers. Cent. Dig. §§ 77, 78, 92, 93; Dec. Dig. § 61.*]

7. SPECIFIC PERFORMANCE (§ 114*)—PLEADING—VALUE OF PROPERTY—NECESSITY FOR ALLEGING.

In a suit for specific performance of a contract to convey property, plaintiff need not plead in the alternative for the value of the property, and, if he only seeks to recover it, no allegation of its value is necessary where the petition shows jurisdiction in the court regardless of such value.

[Ed. Note.—For other cases, see Specific Performance, Dec. Dig. § 114.*]

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Action by J. R. Cheek against W. H. Nicholson and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

John Charles Harris, for appellant. C. A. Teagle and Sewall Myer, for appellees.

PLEASANTS, C. J. This suit was brought by appellant to recover compensation for services rendered by him as agent for appellees in the sale of real and personal property belonging to appellees.

Omitting the formal parts and the description of the property alleged to have been sold by appellant for appellees, the petition is as follows: "That heretofore, to wit, on or about the 25th day of November, 1908, as copartners in business under the firm name and style of W. H. Nicholson & Co., defendants employed plaintiff, J. R. Cheek, to procure a purchaser for them of all of their certain leasehold rights, mineral rights and property rights of every kind, with the oil wells situated thereon, whether producing,

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

dry or in process of drilling, and all personal property situated thereon in and to eight acres of land in the Butler and James Jones subdivision of the John Brown Jones one-third league in Harris county, Tex., particularly described as follows: * * * And all of the above-described property defendants were anxious to sell and employed plaintiff, J. R. Cheek, to obtain a purchaser therefor, agreeing to pay plaintiff for his services the sum of 10 per cent. commission on the selling price for said property, which was, to wit, $30,000, thus making a total commission to plaintiff, in the event he should secure a purchaser, of $3,000. And the aforesaid $3,000 commission defendants agreed to pay to plaintiff, Cheek, which plaintiff agreed to accept in the following manner, to wit: Defendants agreed to deliver to plaintiff, J. R. Cheek, one rotary drilling rig complete with all necessary appliances used in connection therewith, including three pumps (with the exception of a boiler), which said drilling rig was then in the Humble oil field and situated on the Butler subdivision of the John Brown Jones one-third league in Harris county, Tex.; the estimated value of said drilling rig being about $2,000. And defendants further agreed, upon the consideration hereinbefore stated, that, if plaintiff should secure a purchaser for the aforesaid property, to also convey by proper deed to plaintiff, Cheek, those certain tracts or parcels of land situated in Harris county, Tex., and being Nos. 14 and 40 in block No. 2 of the Butler subdivision of the John Brown Jones one-third league, according to the map thereof, situated in Harris county, Tex.; it being understood that the plaintiff, Cheek, should take said land subject to an oil lease outstanding, reserving a one-sixth royalty. And plaintiff, J. R. Cheek, says that he carried out all of the terms and conditions of his aforesaid contract with defendants and procured a purchaser for the aforesaid property in, to wit, the Sun Company, incorporated, a corporation duly incorporated and duly authorized to do business in the state of Texas, having its principal office in the city of Beaumont, Jefferson county, Tex. And plaintiff, J. R. Cheek, says that, by his procurement under the terms of his agreement with defendants, the aforesaid defendants, as vendors, and the aforesaid Sun Company, incorporated, as the purchaser, on the 25th day of November, 1908, entered into a binding written contract (a substantial copy whereof, without the signatures, is hereto attached, made a part hereof and marked 'Exhibit A') by which defendants agreed to sell and the Sun Company agreed to buy the aforesaid property, for the agreed sum of $30,000, and this plaintiff says that then and there defendants became obligated to pay plaintiff, J. R. Cheek, the full amount of his commission in the sum of $3,000 to be paid as hereinbefore stated. But plaintiff, J. R. Cheek, says that the

defendants, though often requested, have failed and refused, and still fail and refuse, to pay plaintiff his commissions on this sale, either in cash or by making the aforesaid deed and aforesaid bill of sale, to plaintiff's great damage in the sum of $4,000. Wherefore plaintiff prays that citation issue to each of the defendants residing in the state of Texas, and that notice issue to each of the defendants residing in the state of West Virginia, and that upon a final hearing plaintiff have judgment against defendants and each of them, individually and as copartners in the firm of W. H. Nicholson & Co., for the aforesaid sum of $3,000, with interest and costs; and that in the alternative defendants and each of them be required to convey by title good of record and in fact, and free from incumbrances, the aforesaid drilling rig and the aforesaid land; and for such other and further relief, both general and special at law and in equity, as to right and justice may appertain."

The defendants answered by general demurrer and general denial, and specially pleaded, in substance: That it never contracted or agreed to pay plaintiff any commission for the sale of the property, but, on the contrary, that it was expressly agreed and understood when the property was placed in the plaintiff's hands for sale that defendants were to receive $37,000 net therefor and were not to pay plaintiff any commission for effecting a sale. That plaintiff, having failed to make a sale for this price, reported to defendants that he could sell the property for $30,000 cash, and defendants thereupon agreed that, if plaintiff could effect such sale, they would convey to him the drilling rig and the two lots of land described in the petition, but it was expressly agreed and understood that plaintiff was to receive no compensation unless the sale of defendants' property was finally consummated and the $30,000 paid to defendants. "That no sale was ever consummated by said Cheek, or by these defendants to said Sun Company, or to any other purchaser who was procured by said Cheek, but that the contract of sale so made with the Sun Company, as is set out in plaintiff's petition, provided that the title to said property should be satisfactory to the Sun Company, and in the event it should not be the Sun Company would not take said property. That thereafter, upon an examination of the title to said property by the attorney for said Sun Company, the said company declared the title unsatisfactory and refused, and still refuse, to purchase the same, though these defendants were ready and willing at all times to carry out the terms of said agreement and convey the property to the Sun Company. That plaintiff never complied with his agreement to make a sale of said property, and at no time found a purchaser who was ready, able, and willing to purchase the same, for that said Sun

Company was only desirous of obtaining a short-time option on said land, as these defendants are informed and believe, for that, at the time that these defendants were drilling wells on the said property, there were other wells being drilled contiguous thereto. That one of such wells was within a few feet of the supposed oil-bearing sands and strata at the time the said option was obtained by the Sun 'Company from defendants. That said contiguous well was completed during the five days' time given under said option, and reports as to its condition were made to the Sun Company, and said company was informed at all times as to the progress made on said well and as to whether or not the same was a producer. That said option was obtained solely for the purpose of acquiring defendants' holdings in the event said well proved to be a producing well, and with the intention on the part of said Sun Company to decline to take said lands if said well proved to be what is termed a dry hole or nonproducer. That said clause as to satisfactory title was placed in said option contract solely for the purpose of giving the Sun Company a legal excuse for refusing to purchase said land in the event said well came in a dry hole, all of which was well known to the plaintiff. That at and prior to the making of said option said Sun Company and the plaintiff, Cheek, well knew that the defendants' title was defective, or that there was a cloud on the title, and knew that if said well came in 'dry' that the Sun Company did not intend to purchase same under said option, all of which defendants are ready to verify."

The cause was tried with a jury in the court below, and after hearing the evidence the trial judge instructed the jury to find for the defendants, and upon the return of such verdict a judgment was rendered in accordance therewith.

The evidence shows that the firm or copartnership of W. H. Nicholson & Co. was composed of W. H. Nicholson, W. H. D. Chapin, J. C. McManus, W. F. Tait, A. D. Simon, D. A. Beatty, and G. E. Gilmore. In regard to his contract with said firm for the alleged breach of which this suit was brought, plaintiff, after stating that he was employed in November, 1908, by Gilmore and Beatty, acting in behalf of said firm, to sell the property of said firm described in his petition, and that at the time he was so employed it was agreed and understood he was to receive no commission from defendants for effecting a sale of the property, and that the price of $37,000 fixed on the property by the defendants was to be net to them, and plaintiff must look to the purchaser for his compensation, testified as follows: "I presented the property to Underwood Nazra, and he could not consider it, because his child had to be operated on and he had to leave the city, and I then presented the property to Mr. Edgar J. Pew, the manager of

the Sun Company, and he telephoned his men to go upon the ground at Humble and make an investigation of the property and report to him. I remained in Beaumont, and the report that his men at Humble made to him was like that which I made to him, and he became interested in the property, and said he would instruct his men to watch it for the next few days. I explained to him I only had about five days in which to sell it, and he said he would instruct his men to watch the production and would let me know. I think it was on the 24th of November I communicated with him, and he told me he would not pay the price asked for the property, which was $37,000. I asked him then if he would meet me in Houston on the morning of the 25th, I think was the date, and he agreed to do that and did, and Mr. D. A. Beatty, Mr. G. E. Gilmore, and Mr. W. H. Nicholson were all there also, and Mr. Pew told me—I had explained to him the price I was offering the property at, $37,000, was net to the seller, and that I would charge a commission of 10 per cent., which he would have to pay in the event of his purchase; the Sun Company would have to pay a commission of 10 per cent. in the event they purchased at $37,000. He told me, he says, 'I would not give over $30,000 for this property,' and he says, 'If you want to make 10 per cent. on it, you will have to put it up to them at $27,000.' 'Well,' I says, 'that is such a reduction I do not imagine they will consider it.' 'Well,' he says, 'that is all I would give.' This conversation took place in the writing room of the Brazos Hotel. Mr. Beatty, Mr. Nicholson, and Mr. Gilmore were waiting for me in the lobby of the Brazos Hotel, and I went out there and informed them of what Mr. Pew said, that the total price he would give for the property was $30,000, and Mr. D. A. Beatty—I am sure he is the one that asked the question—wanted to know what I got for it, and I told him I would charge 10 per cent. for selling, anyhow, and he said this, 'Isn't that an awful high price?' And I says, 'Yes, I am a high-priced man.' Well, Mr. Beatty, Mr. Gilmore, and Mr. Nicholson held a conference among themselves. Considerable time elapsed, and there was a drilling rig and two lots of land that they owned, either individually or belonging to the company, I do not know which, that had not been submitted to Mr. Pew, and I agreed to take the drilling rig in, and there was two acres of land which there was a lease on, somebody had a lease on, and a drilling rig with three pumps, but without a boiler, they offered that rig. Nicholson said he would be willing to pay $2,000 for the rig, and the lots of land were reasonably worth $300 apiece, and there was two of them, I think something like that, $500 apiece. Anyhow, I agreed to take the two lots of land and the drilling rig for my commission. They held another conference, and Mr. D. A. Beatty did not want to make that

trade so much as the others did, but he said he wanted to get rid of it, 'All right, we would go ahead and do it.' And we then went into the barroom of the Brazos Hotel, where they have tables, and sat down at a table, and I explained to Mr. Pew we had traded, and they got out a list of the property, and, between the time I had submitted the property to Mr. Pew and that time, there had been moved upon the ground a new standard rig at a value of $600, and Mr. Pew claimed that should go in with the purchase. I did not say anything for some time, and neither of the defendants would agree to that, and the trade seemed about to be broken up, and I called Mr. Pew aside and explained to him I had never submitted that drilling rig to him, because at the time I submitted the proposition to him the standard rig was not in existence; it had not been ordered. He says, 'That is all right, I will cut that out.' And he went back and told them, 'I will pay you $600, cost of that standard rig,' and then it was agreed we go to a lawyer and have the papers drawn up, and Mr. Pew suggested they go either to Hutcheson or Mr. Stone, and we went to Mr. Tom Stone's office, and they dictated to Mr. Stone the substance of the contract, which he took down in longhand, made notes of, and when he got through with that I dictated a memorandum of my compensation, which he took down in longhand, and from which he made out a bill of sale to me for the drilling rig and a deed to the two-acre lots of land there; I considering my services ended. Under the terms of that contract they had a certain length of time. The date of the expiration of the contract was the next time I was in Houston, and I was present at the time the deeds were to be delivered and the money paid over. There was also there, besides me, Mr. D. A. Beatty, Mr. G. E. Gilmore—Mr. Nicholson was not present—but Mr. T. H. Stone and Mr. Read, an attorney here, were present. I do not remember his initials. He was there, and a discussion came up as to whether the title was good or not. Mr. Stone claimed there was a much larger amount of the title outstanding than Mr. Read claimed was outstanding. I asked Mr. Read if he admitted that any part of the title was outstanding, and he said, 'Yes, there was certainly,' I think, '3 per cent.,' and he did not believe it would run over 7. But Mr. Stone claimed there was a good deal more. It seemed to me he said about 15 per cent. it run; I think he said from 10 to 15 per cent., something like that. I don't remember the exact amount. And they were discussing it and advising as to whether they could afford to close up on that or not, and I suggested that they figure out what the amount was outstanding and close up on the balance of it, and that the defendants would not agree to, and I stepped out of the room, and when I returned they were signing an agreement to call the trade off. It was

then that I explained to them that I had been a party to making the trade and I would not agree to calling the trade off unless they paid me my compensation, and they declined to do it, and went on and called the trade off. They never did pay me any part of my compensation, and they never did execute the bill of sale for the personal property and deliver to me or execute a deed to the property and deliver to me."

The contract referred to by plaintiff, and which was duly executed by the defendants and the Sun Company, omitting the description of the property contracted to be sold, contains the following provisions: "The State of Texas, County of Harris. Know all men by these presents, that we, W. H. D. Chapin, J. C. McManus, W. F. Tait, of Wood county, West Virginia, and A. D. Simon of Marion county, West Virginia, acting herein by our attorney in fact, D. A. Beatty, and W. H. Nicholson and G. E. Gilmore, both of Harris county, Texas, and D. A. Beatty of Wood county, West Virginia, for and in consideration of thirty thousand ($30,000.00) dollars cash, to us in hand paid and to be paid, of which sum fifty and 00/100 dollars has this day been paid as earnest money, the remainder of the consideration of thirty thousand dollars ($30,000.00) to be paid as hereinbefore provided, by payment to D. A. Beatty, our attorney in fact, by Sun Company, receipt of which said sum of fifty and 00/100 dollars earnest money, is hereby acknowledged, agree and bind ourselves to grant, bargain, sell, convey and deliver unto Sun Company, a corporation with its Texas domicile at Beaumont, Jefferson county, Texas, all of our leasehold rights, mineral rights and property rights of every kind, with the oil wells situated thereon, whether producing, dry or in process of drilling, and all personal property and other property hereinafter specified situated thereon in and to eight (8) acres of land in the Butler and James Jones subdivision of the John Brown Jones one-third (⅓) league in Harris county, Texas, particularly described as one-third (⅓) league in Harris county, Texas, particularly described as follows: * * * We further agree to furnish within two days hereafter a complete abstract of title to the above-described property for examination by Sun Company, and said Sun Company shall have three days after delivery of the same for the examination thereof and the consummation of this trade. The title to the various tracts of land described herein to be good and satisfactory title; and sellers agree to execute warranty deeds to the same. If title is not satisfactory to Sun Company, all parties are released herefrom. Sellers or grantors herein further agree to endeavor to procure the consent and ratification of the various lessors of the property afore described to this sale and conveyance. Witness our hands in triplicate at Houston, Texas, this 25th day of November, A. D. 1908."

Plaintiff further testified: "It is not a fact at that very time when I went back and told them Pew would not pay me any commission, I would have to get it out of them, they said, 'Cheek, if you will get us $30,000, we will allow you the drilling rig.' This is what was said: Mr. Beatty says, 'What do you charge, anyhow?' I says, '10 per cent.' And he says: 'Great goodness! That is a high price.' And I says, 'I am a high-priced man.' Up to that time these defendants had never offered to pay me one cent for any of my services, not before that morning. No, that was not the transaction. We were getting down now to talking about this transaction. I was first to get my commission out of the other side, right up to the morning of the 25th, and on the morning of the 25th my getting commission out of the other side ceased, and the getting it out of them commenced. That is a fact, that is the way it was. Mr. Beatty, Mr. Gilmore, and Mr. Nicholson were all there, and Mr. Pew. They said: 'If you will sell this property for $30,000, we will give you those two lots and the drilling rig.' None of the defendants told me, before I was trying to sell the property, the title was bad; and Mr. Read never told me; and I never heard him say anything about the title being bad until they had called, said the deal was off. Mr. Beatty did not tell me the lots I was to get had a bad title, or that the rotary rig did. I did not know whether or not as a fact the titles to the lots they were to give me were good. When anybody offers me anything for sale, I assume they own it. Mr. Pew did not tell me all he wanted was an option. He said he wanted to buy the property. I never did try to sell him an option. I did not state to the defendants all I was selling was an option. I had been in the next room and came in the room just as they were writing up the agreement calling the deal off. I was never advised from any source whatever the title in the Butler subdivision was a bad title, and I never bought any land in it or made any lease in it. This was the first transaction I had in the Butler." Plaintiff further testified: "They (the defendants) called it (the trade) off because they could not deliver the title; that was the reason they gave."

In this state of the pleading and evidence, the trial court erred in instructing the jury to return a verdict for the defendants. The record fails to show that any ruling was made by the trial court on the general demurrer, and it must therefore be presumed to have been either abandoned or overruled, and in neither case could the action of the court in instructing a verdict for the defendants be sustained on the ground of any imperfection in the plaintiff's petition. To hold otherwise would be to permit a trap to be laid for the careless or unskilled pleader by cutting off his right to amend. Such practice is not sanctioned by our decisions.

It cannot be said, however, that the petition in this case should be held bad on general demurrer, and counsel for appellees does not so contend. But it is insisted that the only cause of action alleged in the petition is one for the recovery of a commission of $3,000 on the sale alleged to have been made by appellant, and, since undisputed evidence shows that plaintiff is not entitled to recover said sum or any amount as commission for his services in effecting the sale, the trial court properly instructed the jury to find for the defendants. It is true that the only cause of action shown by the evidence is one for the recovery of the property which defendants agreed to give plaintiff for making the sale, or the recovery of the value of said property. The petition may not sufficiently allege the value of the property, and such value is not shown by any evidence in the case. But the petition does ask in the alternative for the recovery of said property, or for specific performance of the contract to convey same, and the facts alleged in the petition and testified to by the plaintiff would entitle him to such recovery.

The allegations of the petition that defendants agreed to pay plaintiff 10 per cent. commission on the sale, or the sum of $3,000, and that plaintiff agreed to accept this in property to be conveyed to him by the defendants, if supported by the evidence, would entitle plaintiff to recover the $3,000 upon the defendants' failure to convey the property. This was evidently the cause of action in the mind of the pleader when the petition was drawn. There being no evidence to support the allegation that defendants agreed to pay plaintiff the $3,000, or any sum whatever, the jury should have been instructed not to return a verdict for the plaintiff for any amount. But it does not follow that because the plaintiff was not entitled to recover the $3,000 claimed by him, or any money judgment against the defendants, that he was not entitled to recover the property which the petition alleges the defendants agreed to give him as compensation for his services. The petition shows that the consideration for the transfer of the property was the service performed by plaintiff in effecting the sale for the defendants, and we do not think that the further allegation that the property was to be transferred by defendants and accepted by the plaintiff in lieu of an agreed commission of $3,000, when shown to be untrue, should defeat the plaintiff's right to recover the property, or have a decree for specific performance.

If the testimony of plaintiff is true, he was entitled to compensation for his services. According to his testimony, he was to get the drilling rig and the two lots of land from the defendants if he sold the other property to the Sun Company for $30,000. The contract between the defendants and

the Sun Company, which 'it is admitted was procured by the plaintiff, is a binding contract of purchase and sale, and not a mere option, as claimed by the defendants. When plaintiff procured the execution of this contract, he had earned his compensation, and his right thereto could not be defeated by a subsequent agreement between the defendants and the Sun Company to cancel said contract. Plaintiff testified that he had no knowledge of any defect in defendants' title when he undertook to sell the property for them, or when he procured the execution of the contract with the Sun Company, and, if this is true, it is immaterial that the defendants and the Sun Company both knew of these defects and both knew at the time the contract was made that the Sun Company would never be required under the contract to take the property. When a broker procures a customer with whom his principal is willing to contract and does make a binding contract of sale, but the sale is not consummated because of defects· in the title of which the broker was ignorant when he procured the customer, the broker is entitled to his commission or compensation. Conkling v. Krakauer, 70 Tex. 735, 11 S. W. 117; Brackenridge v. Claridge, 91 Tex. 527, 44 S. W. 819, 43 L. R. A. 593.

In a suit for the recovery of specific property, an allegation of the value of the property is only necessary for the purpose of showing jurisdiction in the court, or to enable the plaintiff to recover such value in event the property cannot be found or cannot be adjudged to·the plaintiff. In a suit of this kind, the plaintiff is not required to plead in the alternative for the value of the·property, and, if he only seeks to recover the property, no allegation of its value is necessary; his petition, as in this case, showing jurisdiction in the court without regard to the value of the property sought to be recovered. The petition shows a cause of action for the recovery of the $3,000 commission, and this gives jurisdiction to the district court. In addition to this a part of the property sought to be recovered is real estate, and, while the contract under which it is claimed is verbal, the defendants have not pleaded the statute of frauds in bar of plaintiff's right to recover land under a verbal contract of sale.

It is further insisted by the appellees that if it be conceded that plaintiff's petition is sufficient to entitle him to recover the property, or to have specific performance of the contract of sale, yet the undisputed evidence shows that the property had ·been sold by the defendants, and therefore judgment could not have been awarded plaintiff for its recovery. The evidence does show that the property had been sold by the defendants prior to the trial in the court below; but the date of such sale is not shown. If the evidence showed that· the defendants sold the property before plaintiff brought this suit, a judgment for the property against the defendants would be worthless to the plaintiff, except as a basis for a new suit to recover the value of the property, and there is force in the contention of counsel for appellees that the court below, in such case, might have properly instructed the jury to find for the defendants. Courts are not required to render vain and worthless judgments incapable of ·being enforced so as to give any practical benefit to the party demanding such judgment, nor is it ordinarily permissible for causes of action to be split and tried by piecemeal. It is, however, unnecessary for us to decide this point. The evidence does not show that the property was sold before the suit was brought, and, if it was sold lis pendens, a judgment against the defendants would be enforceable against the purchaser. In the absence of evidence showing the date of the sale, we cannot presume that a judgment for the property against the defendants would not be enforceable.

We are of opinion that the judgment of the court below should be reversed, and the cause remanded, and it is so ordered.

Reversed and remanded.

### On Motion for Rehearing.

In the opinion heretofore filed in this cause, in discussing appellees' contention that the judgment of the court below should be affirmed because the undisputed evidence shows that the property claimed by the plaintiff had been sold by the defendants, we say: "If the evidence showed that the defendants .sold the property before plaintiff brought this suit, a judgment for the property against the defendants would be worthless to the plaintiff, except as a basis for a new suit to recover the value of the property, and there is force in the contention of counsel for appellees that the court below, in such case, might have properly instructed the jury to find for the defendants. Courts are not required to render vain and worthless judgments incapable of being enforced so as to give any practical benefit to the party demanding such judgment, nor is it ordinarily permissible for causes of action to be split and tried by piecemeal. It is, however, unnecessary for us to decide this point. The evidence does not show that the property was sold before the suit was brought, and, if it was sold lis pendens, a judgment against the defendants would be enforceable against the purchaser. In the absence of evidence showing the date of the sale, we cannot presume that a judgment for the property against the defendants would not be enforceable."

In making the above statement the court did not have in mind the existence of our statute requiring notice of the pendency of a suit affecting land to· be registered in order to charge a purchaser of such land pendente

lite with constructive notice of the pendency of the suit. Act of 1905, Sayles' Ann. Civ. St. Supp. 1906, tit. 68a. Under this statute a judgment in favor of appellant for the land in controversy would not be enforceable against the purchaser unless it was shown that notice of the suit was registered as required by the statute, or that the purchaser bought with actual notice thereof. If actual notice was shown, a judgment in this suit would be binding upon the purchaser as to both the land and the personal property.

But, independent of the doctrine of lis pendens, we do not think appellees' contention in this regard is sound, and we did not so hold in our former opinion. The right of plaintiff to recover in a suit for property cannot be defeated by the defendant showing that he had sold the property some time prior to the trial of the cause. If the evidence showed that the property was sold before the suit was brought, and plaintiff knew that fact at the time he brought the suit, and the suit was only to recover the property with no prayer for recovery of its value, the appellees' contention might be sound; but, under the facts of this case, it cannot be sustained.

We have carefully considered the very forcible motion for rehearing filed by appellees and have concluded that we should adhere to our original opinion, and the motion is therefore overruled.

Overruled.