**C. C. SLAUGHTER CATTLE CO. v. POTTER COUNTY. (No. 1820.)**

(Court of Civil Appeals of Texas. Amarillo. Nov. 9, 1921. Rehearing Denied Dec. 14, 1921.)

**1. Public lands ⬤⟿173(14) — Instrument held contract of sale and not option.**

An agreement between a county and another concerning school lands, providing for re-entry and forfeiture unless a certain sum was paid on or before 20 years, *held* a contract of sale, and not option to purchase, under Const. art. 7, § 6, an implied contract existing on the part of the purchaser to pay the agreed compensation on acceptance of the contract of sale, though it provided that on default in interest the obligation would "become null and void and of no binding force and effect on either party hereto."

**2. Contracts ⬤⟿153 — Construction rendering legal adopted.**

If a contract is doubtful, or if there may be two interpretations, one rendering it lawful and the other unlawful, that construction which will render it legal will be adopted.

**3. Public lands ⬤⟿173(14) — Construction of counties' sole contract by parties will be given weight.**

In an action involving question whether contract between county and another concerning school lands was a contract of sale or only an option to purchase, the fact that the parties construed such instrument as a contract of sale for more than 20 years should have some weight in determining the character of the instrument.

**4. Public lands ⬤⟿173(14)—Recitation as to option to purchase school land held not to render instrument invalid as being based on option.**

A contract of sale of school lands by a county *held* not invalid by reason of a recitation therein, "Under and by virtue of an option of purchase said F. has with the county, under an order of this court," it being clear that the option was not the dominating or controlling consideration for the sale, under Const. art. 7, § 6, consideration for the option not being credited on the purchase price.

**5. Public lands ⬤⟿173(14)—"Option" not use of power to convey.**

An "option" is not the use of a power to convey, but a surrender of it for the time, or which prevents for the time the right of alienation, and execution of option on school lands by commissioners' court of a county was not a valid exercise of power of sale by such court under Const. art. 7, § 6.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Option.]

**6. Vendor and purchaser ⬤⟿3(4)—Option contract and contract of sale separate and distinct contracts.**

An option contract and a contract of sale of land are in fact two separate and distinct contracts, and the consideration for the two contracts are as separate and distinct as the contracts themselves, and, even if the terms embodied in the option upon election for the sale of the land are not changed and placed in a separate instrument, the two contracts are nevertheless separate contracts.

**7. Contracts ⬤⟿137(2)—Valid portion of contracts sustained.**

Where two promises, one of which is illegal, are made upon a lawful consideration, the promise which is unobjectionable is only held to be enforceable, and the distinction between a contract a part of which violates a statute and a contract a part of which contravenes public policy is no longer recognized.

**8. Contracts ⬤⟿137(1)—Effect of partial illegality stated.**

Where one provision in a contract which does not constitute the main or essential feature or purpose is void for illegality or otherwise, but is clearly separable and severable from the other parts which are relied upon, such other parts are not affected by the invalid provision and may be enforced as if no such provision had been incorporated.

**9. Contracts ⬤⟿141(1)—Declared against public policy only where injury is clear.**

Where public policy is not settled by recognized principles, courts use their power to declare a contract in contravention of public policy only in cases in which the injury to the public is clear; the validity of the transaction being presumed.

**10. Public lands ⬤⟿173(14)—Irregular sale of school lands may be ratified.**

A sale of school land, being within the scope of the powers conferred upon the commissioners' court, though irregular in the manner of sale through first giving an option, is not void where fully executed, but is only voidable, if either, and hence subject to ratification by such court.

**11. Public lands ⬤⟿173(14)—Commissioners' court alone held to have authority to dispose of school land.**

The beneficiaries of school lands have no voice in its disposal, and no powers are granted them to make, approve, adopt or ratify a sale; such powers being confided exclusively to the commissioners' court of the county.

**12. Public lands ⬤⟿173(14)—Facts previous to execution of sale of school lands by commissioners' court cannot be questioned.**

When the judgment or discretion of the commissioners' court has been fairly exercised, either in making a contract of sale of school lands, or in ratifying it after full execution, it is too late for any one to call in question the sale by inquiring into facts existing prior to the execution of the power.

Hall, J., dissenting.

---

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Lubbock County; W. R. Spencer, Judge.

Action by Potter County against the C. C. Slaughter Cattle Company and others. Judgment for plaintiff, and named defendant appeals. Reversed and rendered.

Coke & Coke, M. D. Gano, and W. H. Flippen, all of Dallas, and W. H. Bledsoe, of Lubbock, for appellant.

H. G. Hendricks and P. F. Sapp, both of Amarillo, and Percy Spencer, of Lubbock, for appellee.

STOKES, Special Justice. The state of Texas granted to Potter county on January 25, 1889, for its common schools four leagues of land numbered 113, 114, 115, and 116 lying in Cochran county. This land was selected by a committee appointed in February, 1888, by the commissioners' court of Potter county. That committee made its report in October, 1888, to the effect that the leagues were common plains land, soil, deep yellow, and covered with sage grass not fit for agricultural purposes but could be used for stock. In May 1890 the county sold the land to H. M. Spaulding for $7,151.04 cash and note for $18,000 payable on or before 20 years at 6 per cent. interest. Spaulding sold the land to others who assumed his note. Default in payment of the annual interest was made and the county brought suit and foreclosed its lien in December, 1894. In February, 1896, the land was sold under the judgment of foreclosure. The county attorney, Lon D. Marrs, was directed by the commissioners' court to bid for the land not exceeding $1 per acre. He bought it in at the sale at 70 cents per acre, and the sheriff thereupon conveyed the land to the county. In May, 1896, some 60 or more citizens of Potter county petitioned the commissioners' court to employ one Willis to sell the land at the price of 75 cents per acre, and to give him an option to that effect. The petition was signed by the leading citizens of the county who were acquainted with the values of land in the plains country at that time. The orders of the court show Willis was so employed for a stated period of time, and that his employment was renewed from time to time, but that he was unable to effect a sale. The last order granting the extension was dated in May, 1897. The county judge at that time, Lon D. Marrs, testified that the county was anxious to sell the land, and that Mr. Willis was the best man they could find for that purpose; that he reported he had advertised the land and he had other agents trying to sell. August 10, 1897, the commissioners' court made the following order:

"It is ordered by the court that the county judge be authorized and instructed to lease the Potter county school lands situated in Cochran county, Tex., to lease the land for not less than two cents per acre payable semi-annually in advance for a term not exceeding eight years. And the county judge is hereby authorized and instructed to make any other lease that he can make for more money than two cents per acre with any term not exceeding ten years. It is further ordered by the court that the county judge shall contract with the lessee to surrender all wells and windmills and improvements placed on said lands, provided said lease shall extend eight years or longer a contract of lease to be made and signed by the lessee and by Lon D. Marrs, the county judge of Potter county, Tex., for said county and to be filed in the clerk's office in Potter county."

November 8, 1897, Lon D. Marrs, as county judge of Potter county, executed to R. S. Ferrel a lease by which Potter county school land was leased to him for a term of eight years beginning January 1, 1898, for the rental of $400 per annum, payable $200 semiannually in advance. On the same day, November 8, 1897, the commissioners' court entered the following order:

"Whereas, it appearing to the court that R. S. Ferrel, of Tarrant county, Tex., has leased the Potter county school lands for a period of eight years, the terms of said lease being fully described in said lease as it appears of record in the county clerk's office in said Potter county, Tex.; and whereas, the said Ferrel has asked this court to grant him an option for the purchase of the above-mentioned lands for a period of five years beginning November 1, 1897, at 75 cents per acre, total number of acres being 17,712, on twenty years' time at 5 per cent. interest per annum, payable semiannually in advance, principal and interest payable at Amarillo, Potter county, Tex., to the treasurer of said county: It is therefore ordered by the court that said option to purchase be, and the same is hereby, granted, provided that said Ferrel faithfully complies with the terms and conditions of his said lease of said land, and continues to fully comply with the provisions of said lease during the grant of option of sale, and it is further ordered by the court that the county judge of Potter county be authorized and instructed to sign in behalf of said county said option."

On the same day, November 8, 1897, Lon D. Marrs, as county judge, executed to Ferrel an option contract in writing to purchase the county school land, reciting that it was executed by virtue of the order of court above set out, reciting also that the contract of option was in consideration of $1 and other valuable considerations, stipulating:

"For and in consideration of the sum of one ($1.00) dollar cash in hand, the receipt of which is hereby acknowledged, and the further consideration of the sum of seventy-five (75) cents per acre, or thirteen thousand two hundred and eighty-four ($13,284.00), dollars to be paid on or before twenty (20) years from the date said Ferrel may or shall designate or elect to convert the option of purchase of the lands herein described, which if not done on or before five (5) years this option and all right

thereto shall become null and void and of no further force or effect; the said thirteen thousand two hundred and eighty-four ($13,-284.00) dollars to be paid said county on or before the expiration of twenty (20) years from the date Ferrel shall designate or elect to purchase said lands, and said county shall only be required to give 'contract for deed,' and no title to be passed until the whole amount of principal and interest thereon at the rate of five (5) per cent. semiannually in advance each year interest shall have been fully and completely paid, and it is further understood and agreed that when said amount of thirteen thousand two hundred and eighty-four ($13,284.00) dollars has been fully paid by the said Ferrel or his heirs or assigns that said county is to make good and sufficient and legal title to the said land in fee simple."

It was agreed in the trial court that there was no lease of the land to Ferrel until the one above referred to as executed November 8th, and contemporaneously with the order granting the option and option contract. On July 1, 1898, the commissioners' court entered an order directing the county judge to execute to Ferrel a bond for title, the form and terms of the orders being copied in the instrument executed by the county judge, dated July 25, 1898, which is in full as follows:

"State of Texas, County of Potter.

"Know all men by these presents that this contract of sale made and entered into this the first (1st) day of July, A. D., 1898, by and between the county of Potter, state of Texas, acting by and through her county judge, Lon D. Marrs, by virtue of an order of the commissioners' court of Potter county, Texas, on the first (1st) day of July, A. D. 1898, of which the following is a copy, and duly entered in the minutes of commissioners' court, in Book 2, page 212: 'July 1, 1898. Court met pursuant to adjournment and all officials of said court present, and the following proceedings were had, to wit: It is ordered by the commissioners' court of Potter county that Lon D. Marrs, county judge of said county, be authorized and instructed to make and deliver to R. S. Ferrel a bond for title of Potter county school lands situated in Cochran county, Texas, under and by virtue of an option of purchase said Ferrel has with Potter county, Texas, under an order of this court, said order being on record on page 153, Book 2; the bond for title to be delivered to the said Ferrel when the first payment is made on said land; said bond for title shall be placed on record in the clerk's office of Potter county, Texas. No commission to be paid for the sale of said lands.'

"Said vendor is hereinafter styled party of the first part, and R. S. Ferrel, of the county of Tarrant, and the state of Texas, hereinafter styled party of the second part witnesseth:

"For the consideration hereinafter named, the party of the first part, by the terms hereof, contract the sale of the lands belonging to the school fund of said Potter county, Texas, situated in Cochran county, Texas, to the party of the second part, the same being known and described as school leagues Nos. one hundred and thirteen (113), one hundred and four-teen (114), one hundred and fifteen (115), and one hundred and sixteen (116), each of four thousand four hundred and twenty-eight (4,428) acres, aggregating in all seventeen thousand seven hundred and twelve (17,712) acres of land, for the sum of thirteen thousand two hundred and eighty-four ($13,284.00) dollars, to be paid as follows, to wit: The sum of thirteen thousand two hundred and eighty-four ($13,284.00) dollars, or any part thereof, to be paid on or before twenty (20) years after date of this contract, with interest at the rate of five (5%) per cent. per annum, interest payable semiannually in advance, on or before the 1st day of July, A. D. 1898, in the sum of three hundred and thirty-two and $10/100$ ($332.-10) dollars and three hundred and thirty-two and $10/100$ ($332.10) dollars on or before the 1st day of January, A. D. 1899, and three hundred and thirty-two and $10/100$ ($332.10) dollars on or before the 1st day of each succeeding July and January. Said interest shall be paid the county treasurer of said Potter county, at the county seat of Potter county, Texas. Said interest in full shall be paid unless said party of the second part or his legal heirs or assigns has paid part of said principal as herein contracted, in which event said five (5%) per cent. per annum shall be calculated upon the amount remaining unpaid, and any principal paid hereon shall be paid upon some interest paying date. And it is specially provided that, should the party of the second part or his legal heirs or assigns fail or refuse for sixty (60) days after any one semiannual interest becomes due to pay the same, then this obligation to become null and void, and of no binding force and effect on either party hereto, and all improvements and appurtenances situated upon said premises shall then become the property of said Potter county, Texas, or her legal assigns, and the party of the second part hereby agrees and binds himself and his heirs and assigns to quit and surrender said premises together with all improvements and appurtenances situated thereon, and the party of the first part may re-enter and take possession of said premises and hold as in her former estate, and thereupon this contract of sale and everything herein contained shall cease and be null and void, and all claims for damages by reason of such re-entry being hereby expressly waived, and the party of the first part shall have no rights hereunder for a specific performance hereof. And it is expressly understood and agreed by and between the parties hereto that said party of the second part and his legal assigns shall be responsible (should this contract be forfeited) to the party of the first part for the time said premises may be held or occupied after such forfeiture. And said party of the second part hereby obligates and binds himself, his heirs and assigns, not to remove or cause to be removed any improvements now upon said premises or that may hereafter be placed thereon. To have and to hold the above-described premises, together with all and singular the rights and appurtenances thereto in any wise belonging unto the party of the second part, his heirs and assigns forever, when the whole of said principal and interest has been fully paid. The said party of the first part agrees and binds said Potter county, himself, and succes-

sors in office to make good and valid fee-simple title to above and foregoing described lands to second party or his legal heirs or assigns, and warrant and forever defend all and singular the said premises unto the said party of the second part, his heirs and assigns, against all persons lawfully claiming or to claim the same or any part thereof.

"In testimony whereof witness my hand in the capacity and office as herein stated at Amarillo, Potter county, Texas, this the 25th day of July, A. D. 1898. [Signed] Lon D. Marrs, County Judge of Potter County, Texas."

This instrument was duly acknowledged by Marrs and recorded in Lubbock county June 5, 1901. Marrs testified that the contract so executed was exhibited to the commissioners' court and its terms approved before it was delivered to Ferrell, but no order was entered.

It was agreed in the trial court that on November 8, 1897, when the option contract was made, and on July 1, 1898, when the order of that date was entered, the market value of the land was 75 cents per acre. The evidence shows the commissioners were acquainted with the value of the land on those dates. They were anxious to sell the land at that time, and had been offering it at that price since employing Willis to sell it. They had refused to lease to Ferrel, who had tried to secure a lease before obtaining the order of August 10th, but the county would not lease because it desired to sell, and only entered into the lease contract and option contract with Ferrel for the reason that it had been unable to obtain a purchaser or offer from any one else. The county sought to sell to obtain funds to supplement the school fund of the county. The county was short on available public school funds and was in need of more money to run the public schools. This was the influence that governed the commissioners' court in desiring to sell the school lands, and for this reason the court was very desirous of making a sale of the land and increasing the available school fund to run the schools for longer terms.

The evidence further establishes that the county since buying in the land at the sheriff's sale had never had an opportunity to sell the land at the price asked, 75 cents, until the sale was made to Ferrel, July, 1898, and that it had during that time made diligent effort to sell the land.

On July 27, 1898, Ferrel by an instrument in writing assigned or conveyed to C. C. Slaughter the land in which instrument, and as part of the consideration for the conveyance it was recited Slaughter should keep "the contracts and agreements and stipulations in my contract of purchase with said Potter county." The contract referred to in the instrument is the one dated July 25, 1898.

The interest payment in advance, $332.10, was paid July, 1898, and each semiannual interest was paid up to and including the interest payment of July, 1900, being the interest up to January, 1901.

On the 2d day of January, 1901, Slaughter paid on the principal $3,284, leaving a balance of $10,000 owing the county. On that date the county treasurer gave a receipt to Slaughter reciting that he received the sum on account of the sale of the school land by contract of sale executed July 25, 1898, leaving a sum of $10,000 still owing the county. The semiannual interest on the balance $10,000 was $250. This was paid semiannually each year, beginning with January, 1901, and July, 1901, up to January, 1906, which paid it up to July 1, 1906. The treasurer issued his receipt regularly upon such payments. The letters of Slaughter accompanying the remittances show the land and the contract of July 25, 1898, upon which each payment was made.

The receipts of the treasurer likewise showed the interest payment to which it was applied under the said contract. The treasurer made his regular quarterly reports of the money received on the contract, and also the payment on the principal, $3,284, January 2, 1901, and the interest payments thereafter. These reports show to have been approved by the commissioners' court at their quarterly terms. The financial ledger also shows each of these payments. Marrs testified that the reports of the payments were made to the courts by the treasurer, and that they were very much interested in them, as the county was needing the money badly to supplement the school funds. He remembered the payment of the $3,284 made January 2, 1901, by Slaughter.

The reports of the treasurer were presented to the commissioners' court, and appended to these reports is attached an affidavit of the commissioners, showing they had actually counted the money and giving the amount due the school fund upon each report. The various amounts are set out in this record, and these reports, with the affidavits of the commissioners, were duly recorded in the minutes of that court together with their confirmation of the report. Some of these reports show after the 1901 payment, as an asset, the $10,000 note. No note in fact was given. Some of the reports show a $10,000 equity in the school land. On January 30, 1906, Slaughter remitted to the county treasurer $10,000, the balance of the principal due on the contract requesting a proper instrument of transfer, suggesting he would have it prepared.

The treasurer advised the commissioners' court of the receipt of the letter and the $10,000. The check was not then accepted as at about that time the question of the validity of the sale was raised. The county

employed the law firm of Madden & Trulove to give an opinion as to the county's right in and its legal status with reference to the land. On the 18th day of August, 1906, the attorneys gave a written opinion, the effect of which was, if the county had asserted a claim sooner, it might have prevailed, but, on account of the receipt from C. C. Slaughter in January, 1901, of $3,284 of the purchase money, the county had probably ratified the sale and might be held as estopped to recover the land.

On November 15, 1906, an order was entered which recited the tender to the treasurer of $10,000 by Slaughter on the contract, and therein declared that it appeared the land had not been sold, and that the title to the same was in Potter county. It was therefore ordered that the treasurer return the check to Slaughter, and the clerk of the court notify Slaughter that no deed would be executed by the court, and that the title to the land was claimed and possession thereof demanded by Potter county. The check was returned as directed, and the clerk notified Slaughter as directed.

On the 29th of November, 1906, Slaughter acknowledged the receipt of the check and the notice stating he had made the tender of the amount due the county for the land which he held subject to the order of the county at any and all times; that no more interest would be paid.

Nothing further appears until on November 16, 1907, Sam R. Merrill, then county judge, wrote Slaughter, calling attention to the tender of the $10,000; that the original account was $13,284, requesting to know when Slaughter paid the difference between the amount tendered and the amount called for by the contract, and also requesting the conveyance from Ferrel to Slaughter. On the 19th of November, 1907, Slaughter answered this letter, giving the county judge the desired information, inclosing the transfer to himself and a complete statement of the principal and interest paid on the land down to date which checked up with the county's books. Some time in the fall of 1907 the county again sought the opinion of a firm of lawyers, Turner & Boyce, as to its rights and the legal status with reference to the land. This firm in their written opinion expressed the view that the county had ratified the sale by receiving the interest and part of the principal on the contract. After this the commissioners decided the county would make to Slaughter a deed upon the payment of the balance of the principal $10,000, with interest thereon from July 1, 1906, the date of the tender. Slaughter, upon receiving information of the court's decision made application February 18, 1908, through his attorney, G. G. Wright, for a deed, and in his written application tendered

$10,808.34, being the principal due Potter county on the contract with R. S. Ferrel for the purchase of the land, and interest from July, 1906. On the 18th of February, 1908, the court entered an order reciting the application made by Slaughter for a deed to the Potter county school land, described in the contract of sale entered into between Potter county and R. S. Ferrel on the 1st day of July, 1898, Slaughter's purchase from Ferrel, and the payment of $10,808.34, which was the full amount, both principal and interest, on the balance of the purchase money due under the contract and order of sale.

It was therefore ordered that the county judge of Potter county, Hon. Sam R. Merrill, execute to Slaughter in the name of the county a general warranty deed to all of said school land giving the survey numbers. On the same day Judge Merrill executed a deed in the name of the county to Slaughter in compliance with the order of the court. The court also on that day entered an order reciting the execution of the deed and its examination by the county attorney, and that it was pronounced by him to be in due form and in accordance with the contract of sale and orders of the court respecting the sale of the land, and it was ordered that the deed be ratified and approved, and that the county judge delivered the same to C. C. Slaughter. The evidence shows the orders and deed were prepared by Slaughter's attorney and sent to the court to execute and enter.

Judge Merrill's testimony covering the action of the court in obtaining the opinion of attorneys shows the court determined to be guided by the opinion of the lawyers so employed, and, if adverse to the view held by some members of the court, that the title to the land was in the county, then to accept the money and execute the deed. The opinion of the counsel being that the county could not probably recover, they determined to make the deed, and did so, as above set out. The members of the commissioners' court which ratified and approved the sale in 1908 were entirely different from those that made the contract in 1898.

C. C. Slaughter conveyed the land in question together with other lands to the appellant, C. C. Slaughter Cattle Company, in 1902, and prior to the complete title from Potter county. After he acquired the land under deed on the 22d day of January, 1910, he, joined by his wife, made another deed to the Cattle Company for the consideration previously paid of $185,412 due on this and other lands. The first deed was never recorded.

The interest paid by Ferrel and Slaughter was used as a part of the county's available school fund. The principal paid by Slaughter in 1901 was invested in part in 1904 in five Potter county courthouse and jail bonds of

$1,000 each, and in part in 1915 in some Potter county Canadian river bridge warrants of $1,000 each. These investments were expressly authorized by the commissioners' court. The remainder of the principal paid was delivered to the county depository in accordance with the law, and it has paid interest thereon to the county which has been used as part of the available school fund. The following agreement was made and filed in the trial court between the parties:

"It is agreed that the land in controversy in 1897 and 1898 and at the time the so-called 'option' and 'contract of sale' or 'bond for title' was severally executed was of the market value of seventy-five cents per acre, that in 1906 it was of the market value of $2.50 per acre, and that in 1908 it was of the market value of $3 per acre. It is also agreed that the rental value of the land in controversy is as follows: From February 24, 1902, to 1906, inclusive, two cents per acre per annum; from 1907 to 1910, inclusive, four cents per acre per annum; from 1911 to 1915, inclusive, five cents per acre per annum; and from 1916 to date, inclusive, six cents per acre per annum. But this agreement as to rental value shall not preclude the defendant from claiming that the plaintiff is not entitled to recover said rental value or all or any part thereof."

The agreement is dated December 16, 1920.

In so far as this record shows, from February 18, 1908, until the suit was filed in September, 1918, no claim was made by Potter county that it had the title to or right of possession to the land in question.

The appellee county instituted this suit originally against C. C. Slaughter, C. C. Slaughter Cattle Company, and R. S. Ferrel on the 25th day of September, 1918. In its first amended original petition it sets up its cause of action in counts. The first contains the statutory allegation in trespass to try title. The second count sets out the order authorizing a lease to Ferrel dated August 10, 1897, and due execution of the lease by Lon D. Marrs, county judge for the county, and certain terms of the lease which stipulated different terms than that embraced in the order of the commissioners' court, alleging that before the execution of the lease Ferrel had requested an option, and that the two instruments were made at the same time and were parts of the same transaction and dependent on each other, each constituting in part a consideration for the other.

The several subdivisions 3, 4, 5, and 6 set up the various orders granting and ordering the lease contract of November 8, 1897, the option contract, the order of July 1, 1898, directing the execution of a bond for title, the instrument executed July 25, 1898, by Lon D. Marrs, also the application for deed, order thereon, the deed, the order approving the same dated February 18, 1908, also the transfer by Ferrel to Slaughter dated July 27,

1898, which have been referred to or set out in our statement of facts.

It was alleged in effect that Ferrel was acting for Slaughter in the matter, and that he received no consideration for the conveyance to Slaughter under an understanding that Ferrel's name should be used in obtaining orders and contracts with the commissioners' court.

It is alleged that the order and contract for option of November 8, 1897, was wholly void in that it was beyond the powers of the commissioners' court to grant and in violation of the Constitution and provisions of the statutes relative to the sale and disposition of county school lands, and that it was in contravention of public policy; that the order of the commissioners' court made and entered July 1, 1898, in favor of Ferrel, was based upon the previous void option attempted to be executed to Ferrel and made in pursuance thereof, and the said purported contract of sale or bond for title executed by Lon D. Marrs on the 25th day of July, 1898, in favor of said Ferrel and the deed attempted to be authorized by the said commissioners' court to C. C. Slaughter executed by Sam R. Merrill as county judge, being all based on the void option as a controlling and dominant consideration for the execution and delivery of the deed, was an attempt on the part of the commissioners' court to convey the school lands, a trust fund under its control, in pursuance of and in consummation of the void option; that no title, legal or equitable, was divested out of the county by either or all of the orders or instruments above mentioned. It is also alleged that the instrument dated July 25, 1897, was itself a mere option, and not a contract of sale or bond for title, and setting out certain clauses in the instrument which is alleged rendered it but an option.

In a third count the county alleges that, if mistaken that the orders, contracts, deed, etc., referred to above were void, then that they should be rescinded and canceled for the reason that the land was sold in 1898 for the inadequate price of 75 cents per acre when it was worth $2 per acre, and that, when the deed to Slaughter was made in 1908, the land was worth more than 10 times 75 cents per acre, and that the commissioners' court could not either in 1898 or 1908 dispose of the school lands held in trust for such an inadequate sum. The county tendered the purchase money and interest paid by Slaughter and offered in all things to do equity. It set up the value of the use and occupation of the land and asked that the same be offset against the interest and principal paid by Slaughter. It prayed for title and possession of the land, for general relief, etc.

The appellant answered by plea of not guilty, and pleaded specially the execution of the lease and option contract and that the county sold the land to Ferrel in July, 1898,

for 75 cents per acre, and thus accomplished what it had been endeavoring to do for several years, and that the sale was valid and binding upon the county. It set up the county had approved and ratified the sale by the acts and orders and payments of principal and interest set out in our statement. It also alleged that prior to the payment of the $10,000 principal owing, the county a question had been raised by the county as to the validity of the sale in 1898, and the county employed attorneys and had submitted to them the facts and requested their opinion as to whether the county had parted with its title to the land. The attorneys gave their opinion that the receipt of interest and part of the principal on the debt gave the county little or no chance of recovery, even though in the absence of those facts it might have done so. After maturely considering the opinions and the facts, the commissioners' court concluded to make the deed and accept the $10,000 balance of the purchase money. The money was paid and the deed executed in pursuance of such deliberation and determination, and by reason thereof the county had set at rest all questions concerning the title, even if the sale had been originally defective.

The appellant also alleged that it was a bona fide purchaser for a valuable consideration, and pleaded the four-year statute of limitation on the theory that the action by the county was one in effect to set aside the deed of February 18, 1908. It alleged that the claim for rent was barred by the two-year statute of limitation, and also that the county was barred by reason of its laches.

The county by supplemental petition, in answer to that portion of the answer setting up the act of making a deed under the advice of attorneys, alleged in effect that when the deed was executed, it was done upon the assumption that the county understood the legal effect of the transactions as affecting the title; that it was mistaken as to the legal effect of its antecedent rights and prior transactions in regard to the school lands, and because of such mistake the commissioners' court in 1908 "believed that they were in duty bound and legally obligated to make said deed to said C. C. Slaughter which they did because of said mistaken belief as to the legal effect of the prior transactions and their legal duties and obligations thereunder; said mistake having been shared by the said C. C. Slaughter"; in procuring the deed, etc., C. C. Slaughter was acting for the cattle company with full notice of the matters herein set forth; that the option and the purported contract of sale was wholly void and unenforceable, and the county could not ratify or become estopped as to said purported contract.

C. C. Slaughter died since the institution of the suit, and appellee dismissed as to him and Ferrel, prosecuting the suit against the C. C. Slaughter Cattle Company alone.

A trial of the cause resulted in an instructed verdict for the county for the land, and upon this verdict judgment was rendered for the county for the land. Under the undisputed evidence under a separate verdict the court allowed the county the rental value of the land from February 24, 1902, to the date of trial and allowed appellant the money paid the county with interest from the date of each payment and offset the rental value against the aggregate sum allowed appellant, leaving a balance in appellant's favor of $15,496.85, for which judgment was rendered.

From the judgment of the court so rendered the appellant appeals.

[1] The first and second assignments present as error the refusal of the court to instruct a verdict for the appellant. The first proposition presented is:

"The instrument designated 'contract of sale,' between Potter county and R. S. Ferrel, dated July 25, 1898, was a contract of sale of the school leagues in question, and not an option, was based solely upon a legal consideration, and was valid and binding on the county, and said Ferrel's assignee, C. C. Slaughter, having paid in full to the county the purchase price specified in said contract, the county's deed made to said Slaughter thereupon conveyed a good title."

Section 6, art. 7, of the Constitution provides lands granted to the counties of the state for educational purposes—

"are of right the property of said counties respectively to which they were granted, and title thereto is vested in said counties. * * * Each county may sell or dispose of its lands, in whole or in part, in manner to be provided by the commissioners' court of the county. * * * Said lands and the proceeds thereof, when sold shall be held by said counties alone as a trust for the benefit of the schools therein."

It is also provided therein that investments of the proceeds shall be made in certain bonds and other securities as may be prescribed by law. It is not questioned, as we understand the contention in this case, but that the commissioners' court, acting for the county, had the power to sell the land in question when it contracted to sell, and that the manner of the sale could be provided by the court. This power cannot well be questioned, as it has been in many cases recognized by our various courts. Logan v. Stephens County, 98 Tex. 283, 83 S. W. 365; Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419; Waggoner v. Wise County, 17 Tex. Civ. App. 220, 43 S. W. 836. A contract in form and substance identical with the one here in question has at least twice been before the courts of this state, in each of which it was sought to have the contract declared an option. The courts in each case declined to hold them options or void on that

contention. In Tabor v. State, 38 Tex. Civ. App. 235, 85 S. W. 835, the court held the vendee acquired the right to the title on complying with the conditions of the purchase. It was said in that case:

"True, the contract of purchase under which they held was by express stipulation subject to forfeiture for failure to pay interest; but in this respect it was not materially different from other executory contracts of purchase which are subject to forefeiture for default of the purchaser."

In the case of Taber v. Dallas County, 101 Tex. 241, 106 S. W. 332, it was said:

"Counsel for the county claim that the contract with Taber is void for want of mutuality. The promise to convey the land to Taber upon the payment of the specified sum and interest and Taber's promise to pay the agreed price are mutual promises, the one a valuable consideration for the other, and mutuality is thereby created. Cherry v. Smith, 3 Hump. 19; 9 Cyc. 333, par. V, note 35. But it is said by the terms of the contract Taber could terminate it at his option by failing to pay interest for 60 days; hence his promise to pay is not a valuable consideration. We are not prepared to hold that Taber could terminate the contract by refusing to pay the interest. The question is not before us, but, admitting that to be a correct interpretation of the terms used, it does not destroy the mutuality of the contract, but is simply an option which the parties contracted for and which may or may not be exercised by Taber (9 Cyc. 333; Waterman v. Waterman, 27 Fed. Rep. 829; Storm v. U. S., 94 U. S. 76)."

It seems to us that case holds there was a contract of sale of the land—something more than a mere privilege to purchase in the future or a mere contract for a right to purchase. It was a sale at an agreed price. That case expressly holds there was mutuality; that is, a promise to convey the land upon payment of the purchase price and interest, one a valuable consideration for the other, establishing mutuality. In other words, there was a contract of sale of land for a price specified contemplating the transfer of the possession of the land, not a sale of the right at election to purchase the land. It seems to us the two cases construing the Taber contract express the same idea —that is, a sale of the land, with a defeasance clause—but in different language. The idea contained in the two cases, we think, is expressed in Law of Oil & Natural Gas, Wilkinson & Richardson, p. 120:

"But if an independent valuable consideration, sufficient to support the contract, has been paid, the fact that further undertakings by the purchasers were not absolute, but merely things which were to be done at his option, would not render the contract void, as being an option or a unilateral contract without consideration. If the matters left optional with him were conditions to his acquiring or retaining the rights granted either expressly or by implication, he might forfeit his right by failure to perform, but the question becomes then one of forfei-

ture of a conditional grant rather than of the validity of an optional or unilateral contract."

We also quote from the case of Texas Co. v. Daugherty, 107 Tex. 234, 176 S. W. 717, L. R. A. 1917F, 989:

"It will be further noted that no condition is expressed or act required of the grantee which preceded the vesting of such estates as the instruments created. Upon the penalty of forfeiture of the 'rights and estates hereby granted,' the grantee was required to begin operations for the drilling of a well for oil or gas within one year or pay a stipulated amount quarterly during the extension period provided; but it was the manifest purpose of the parties that the estate created should constitute a present grant, and that the grantee should perform these acts after taking possession, which rendered them conditions subsequent. A fee may pass by deed upon a condition subsequent to the same extent as though the condition did not exist, subject to the contingency of being defeated according to the condition. And here, if any property was conveyed, there was a present grant, but liable to be defeated by the grantee's failure to perform the requirement in respect to beginning operations for the drilling of a well for oil or gas, or, in lieu thereof, making the quarterly payment provided. The grant amounted to a defeasible title in fee to the oil and gas in the ground, if oil and gas in place are capable of ownership and conveyance."

We also cite the cases of Pierce, etc., v. Woodrum, 188 S. W. 245; Price v. Biggs, 217 S. W. 236; Hickernell v. Gregory, 224 S. W. 691; McCaskey v. McCall, 226 S. W. 432.

The instrument in question recites the county "contracts the sale of the land" to Ferrel for the thereafter mentioned consideration, which is for the sum of $13,284, which was to be paid on or before 20 years from date, and interest was to be paid in advance semiannually, $332.10 "on or before the 1st day of July, A. D. 1898," and thereafter semiannually that sum was to be paid on the 1st day of each succeeding July and January. The order of the commissioners' court which bears date July 1, 1898, is made part of the contract and directs the county judge to execute a bond for title, but he should not deliver the bond until the first payment was made. There is a habendum clause with the usual stipulation that Ferrel is to have and to hold the described premises when the whole of the principal and interest is paid. Potter county bound itself to make a good and valid fee-simple title to the land and give a deed with full covenants of warranty. The instrument is dated at its conclusion July 25, 1898. It is insisted by counsel for the county that Ferrel "does not bind or obligate himself to buy the land nor to pay the purchase price or the interest." In the Tabor Case the Supreme Court says the county promised to convey the land to Tabor, and that Tabor promised to pay the agreed price; that these promises were mutual promises. It is therefore clear the

Supreme Court and counsel for the county do not agree on this point. If the agreement to take the land and pay for it is not expressed, it is clearly implied. The law will imply a contract on the part of Ferrel to pay the agreed consideration for the land when he accepted the contract of sale of the land. Jones v. Gammel, 100 Tex. 320, 99 S. W. 701, 8 L. R. A. (N. S.) 1197. The consideration to be paid was not for the privilege of buying the land, but it was the agreed value of the land. There was no consideration to pay for an option by the terms of this contract. The mutuality was one agreeing to convey it for, and the other agreeing to pay, the consideration which was the price of the land. There was therefore no condition required to be fulfilled by Ferrel which preceded the vesting of the estate created by the contract. It is manifest the purpose was to create an estate in the land, subject to the condition mentioned. The contract was not to be delivered until the first payment was made. By its terms the payment was contemporaneous with the execution of the contract. It was not a payment independent of the price of the land, but was part of the price. It was not a payment for a privilege, but a payment for a present interest in and to the land. The order of the court evidences the county intended a sale. A bond for title was to evidence the county's obligation, and there was to be no commission "paid for the sale of said lands." The fact that the bond for title was to be made under the option contract theretofore given renders it certain the court was not executing or giving another option, but it was to be a sale without commission charges. By the very terms of the contract it contemplated Ferrel taking possession of the land and improving it. It further evidences that the contract vested an estate in Ferrel. If he failed to pay the interest as stipulated, the county, if it re-entered, should be reinvested "as in her former estate." If the county had never been divested of "her former estate," there would be no necessity of reinvesting it. So we think it manifest the contract vested in Ferrel a present estate in the land, subject to be divested by the defeasance clause therein. This clause reads:

"And it is specially provided that, should the party of the second part or his legal heirs or assigns fail or refuse for sixty (60) days after any one semiannual interest payment becomes due to pay the same, then this obligation to become null and void and of no binding force and effect on either party thereto, and all improvements and appurtenances situated upon said premises shall then become the property of said Potter county, Texas, or her legal assigns, and the party of the second part hereby agrees and binds himself and his heirs and assigns to quit and surrender said premises together with all improvements and appurtenances situated thereon, and the party of the first part may re-enter and take possession of said premises and hold as in her former estate, and thereupon this contract of sale and everything herein contained shall cease and be null and void, and all claims for damages by reason of such re-entry be hereby expressly waived, and the party of the first part shall have no right hereunder for a specific performance hereof."

It was agreed in case of forfeiture that Ferrel should be responsible for the time the premises should be held or occupied after such forfeiture that he would not remove any improvements then upon the premises or that may thereafter be placed thereon. It is insisted this clause renders the contract an option; that, if Ferrel should fail or refuse to pay any interest payment within 60 days after it fell due, "then this obligation to become null and void and of no binding force and effect on either party hereto"; that at his election no title vested. This provision is the usual clause inserted in bonds for title and in many forms of executory contracts. In such instruments it has been usually construed as giving the vendor the right to either declare a forfeiture or sue for the purchase price. It does not render the contract absolutely void and nonenforceable. The contract of sale nevertheless is enforceable. The term as used means simply voidable, and not void, and is inserted for the benefit of the vendor. In the case of Walker v. Emerson, 20 Tex. 707, 73 Am. Dec. 207, an instrument provided that, if the vendee failed to pay a note which was part of the purchase price for the land, the agreement should be "null and void." After reviewing the charge of the court, Judge Roberts said:

"The true position on that subject is that the failure to pay the purchase money when due gave Emerson [the vendor] the alternative option to sue on the note and subject the land and other property to its payment, or to bring a suit for the land, by which he could have ejected Izard [the vendee] from it, unless perhaps Izard should bring the money into court and claim a specific performance of the contract, not having repudiated it otherwise than by failure in point of time or payment. Estes v. Browning, 11 Tex. 246; Hill v. Still, 19 Tex. 76; 1 Story, Eq. Jur. § 776. The failure to pay the purchase money did not of itself annul the contract; but it gave Emerson, with certain equitable contingencies, the right to do so. He could waive this right, and let the contract stand."

This view is sustained and followed by many cases in this state and in other jurisdictions with reference to such provisions. It quite frequently arises in executory contracts made by agents or brokers. We cite the following cases as illustrating the effect of such provisions in contracts: Stewart v. Griffith, 217 U. S. 323, 30 Sup. Ct. 528, 54 L. Ed. 782, 19 Ann. Cas. 639; Mason v. Caldwell, 5 Gilman (Ill.) 196, 48 Am. Dec. 330; Cartwright v. Gardner, 5 Cush. (Mass.) 273;

Ogden v. Hatry, 145 Pa. 640, 23 Atl. 334; Woodland Oil Co. v. Crawford, 55 Ohio St. 161, 44 N. E. 1093, 34 L. R. A. 62; Wilcoxson v. Stitt, 65 Cal. 596, 4 Pac. 629, 52 Am. Rep. 310; Rampton v. Dobson, 156 Iowa, 315, 136 N. W. 682, 3 A. L. R. 569; Davis v. Roseberry, 95 Kan. 411, 148 Pac. 629, 3 A. L. R. 564; Barrett v. Dean, 21 Iowa, 423; Steel v. Long, 104 Iowa, 39, 73 N. W. 470; Allison v. Cocke's Ex'r, 106 Ky. 763, 51 S. W. 593; Moss v. Wren, 102 Tex. 567, 113 S. W. 739, 120 S. W. 847; Redwine v. Hudman, 104 Tex. 21, 133 S. W. 426; Hamburger v. Thomas, 118 S. W. 770; Heath v. Huffhines, 152 S. W. 176; Cheek v. Nicholson, 133 S. W. 707; O'Donnell v. Chambers, 163 S. W. 138(2); La Prelle v. Brown, 220 S. W. 151.

It is insisted that the added words "no binding force and effect upon either party hereto" are broader than if the contract had simply said "null and void." The case above cited, Hamburger v. Thomas, 118 S. W. 770, construed a clause substantially the same as the contract here under discussion, and the Court of Civil Appeals held that it was a sale, not an option. The Supreme Court did not discuss to any extent that feature of the contract when the case was before it, but affirmed the case upon other grounds, however, apparently assuming the contract to be an option. 103 Tex. 280, 126 S. W. 561. If the contract is "null and void," it is so as to all the world as well as to the parties to the contract. It neither binds nor bars any one. The words relied upon add no force to the clause, in our judgment, either one way or the other. If the clause would mean only voidable at the election of the county, if only the term "null and void" was used, it would mean the same with the added clause. As used, if the county elected to forfeit the contract, then it would be of no binding force or effect upon either party. The contract would indicate the county could enter and take the land whether Ferrel refused to pay the interest or not. He may have elected to pay and tried to pay; yet, if he failed, the county was not to be deprived of its right of forfeiture simply because he had not refused. We think the paragraph, when properly understood and interpreted, declares just what the courts have uniformly held with reference to such defeasance clause. This entire clause is one long complex sentence, with several qualifying clauses, and somewhat redundant. It is stipulated that upon failure to pay the interest the improvements shall then become the property of the county. Ferrel agrees to quit and surrender possession, and the county may re-enter and take possession and hold, as in her former estate, and thereupon the contract of sale shall cease and be null and void. If it was null and void upon failure to pay the interest, it was useless to declare that upon re-entry

and reinvestment it was again null and void. When the interest was not paid it was agreed the county "may" enter and reinvest herself as in her former estate, and all improvements on the premises should become the property of the county, and Ferrel agreed to quit and surrender possession, and "thereupon" the contract of sale and everything contained therein should cease and be null and void. When the county so elected, Ferrel waived damages occasioned by the re-entry, and the county had no right for specific performance. In other words, this clause simply recognized the county's right to be that of any other vendor under an executory contract when the purchase money is not paid by the vendee, either to affirm or disaffirm the contract. If the county disaffirmed the contract as a matter of law, it could not sue to specifically perform it; it could not pursue both remedies. The county, to be fully protected, secured an agreement if there was default it could re-enter and reinvest itself if it chose that course. Ferrel agreed that the county "may" re-enter. This does not mean upon default that the county shall re-enter or shall be reinvested. It may if it chooses. The election was left with the county, where the law places it upon default, with every vendor in executory contracts. It seems to us the plain meaning of the contract is that after the default the contract is not binding if the county re-enters and reinvests itself of its former estate, and this depended upon its exercising such right. If it did so, it should not be subjected to damages; neither should it sue for specific performance. The authorities above cited show this is the construction placed upon provisions such as this one contains. The parties evidently tried to avoid the necessity of judicial construction by agreeing beforehand that the county could do just what the law authorized it to do. The contract did not preclude Ferrel from tendering the purchase money after default if he could show the necessary equitable ground for doing so. All it precluded him from doing was that he should not sue for damages upon re-entry.

[2, 3] If the contract is doubtful or if there may be two interpretations, one rendering it lawful, and the other unlawful, the rule will require the adoption of that construction which will render the contract legal. It is to be presumed the parties knew the law and intended to obey it. If, therefore, it was illegal to give an option contract and it is doubtful whether this is a contract of sale or an option, we should interpret it to be a sale contract. Foard County v. Sandifer, 105 Tex. 420, 151 S. W. 523; Matagorda County v. Casey, 49 Tex. Civ. App. 35, 108 S. W. 476; Brazoria County v. Padgitt, 160 S. W. at page 1174. The Supreme Court in

the Tabor Case, while intimating that the contract did not relieve Tabor of an obligation to pay, held, for the purpose of that case, it would be conceded that it was an option, but in doing so this did not affect the mutuality of the contract of sale. And the court further said, if it was an option, going into possession, making improvements, paying interest, etc., was sufficient to show a contract, and this related back and made a good contract from the beginning. So, when Ferrel and his privies paid the interest and principal and went into possession of the land, it evidenced an election which related back to the beginning, making a good contract from that time. This is not a question of ratification by the county, but shows an agreement by both buyer and seller to consummate a valid sale. We construe the instrument in question a contract of sale with a defeasance clause depending upon nonpayment of the purchase money agreed upon. It seems to us this contract has been held both by the Court of Civil Appeals and by the Supreme Court to be a contract of sale. Now, after the parties have relied upon it for 20 years and paid for the land as agreed upon, we should not hold that no title vested or could vest under it. The numerous cases, both in this state and other jurisdictions, show in many instances what appear to be conflicts upon contracts of this character, but in many cases certain features of the contracts, sometimes distinguishable, determine the holdings of the courts thereon. We have not reviewed these cases for the reason that we could not hope to make more clear the rules for determining whether an instrument is a contract of sale or an option. It would seem under the facts of this case that the parties to this instrument for more than 20 years have interpreted this contract as one of sale. This practical construction should have weight with the court in determining the character of the instrument executed and acted upon by the parties thereto.

The appellee presents in reply to all of appellant's assignments counter propositions that the trial court did not err in peremptorily instructing the jury to find for the county: (1) Because the alleged contract of sale of July, 1898, and the order therefor were made "under and by virtue of" a five-year option granting the privilege to the optionee to purchase the land within twenty years at 5 per cent. interest, and that the deed made in 1908 to Slaughter was in pursuance of and based upon the alleged contract of sale and the five-year option. The transaction was in excess of the power of the commissioners' court relative to the disposition of the school lands, and in contravention of the Constitution and the public policy of the state of Texas, rendering the same wholly void. (2) The order and con-

235 S.W.—20

tract thereunder, August, 1897, being in contravention of the Constitution and public policy and in excess of the power of the court, were void in their inception, and all muniments of title which grew out of same and made in pursuance thereof are. likewise void as a claim of title to said land. (3) Under the Constitution the power is conferred on the commissioners' court to sell the county's school land, with untrammeled judgment. A five-year option to the optionee within the period at 75 cents per acre is an attempted suspension of the power granted and in contravention of the Constitution and public policy of the state, void when made, and any rights claimed thereunder are likewise void.

The contract of July 25, 1898, being an executory contract of sale of the land, as determined by us, it therefore follows, when Ferrel and his assignee complied with the conditions therein and the county conveyed the land by a proper and duly authorized deed, the title vested in the appellant as purchaser, unless the consideration therefor was illegal or the contract and conveyance are founded upon an antecedent contract void because of no power to execute or against public policy, which so entered into or dominated the subsequent instruments as to destroy them as binding obligations upon the county.

The pleadings and evidence in this case fail to show that there was compulsion or duress by the prior option contract in making the sale, but, on the contrary, the undisputed evidence is that the county had earnestly and anxiously sought to sell the land for something near two years at the price obtained, and had employed an agent to secure a purchaser at that price, and that Ferrel was the only purchaser that could be found. The impelling motive to the sale was the then pressing need of the public schools in the county. It is admitted the market value of the land at that time was 75 cents per acre, and the evidence also shows this was its market value as well as its agreed value. There is no charge of fraud against the commissioners' court, Ferrel, or any one else, and the evidence conclusively shows there was none. In so far as this record shows, the commissioners' court acted in the utmost good faith in discharging its duties with reference to the land, except they had given a five-year option to Ferrel prior to the sale, which it is asserted was void because no such power was vested in that court under the Constitution and laws of the state, and that it was also in contravention of public policy.

[4, 5] The county's whole contention or cause of action is based upon the following clause in the order of July 1, 1898:

"Under and by virtue of an option of purchase said Ferrel has with the county, under an order of this court"

—which is copied in the premise of the contract of July 25, 1898.

It is the contention of the county that, under the powers granted to the commissioners' court "to sell and dispose" of the county school land, an option given an optionee granting him the privilege of purchase for a stated period is void as being without authority or power and contravening public interest and against the public policy of the state. In this appellee appears to be sustained at least to the extent where the option would have the effect to be in restraint of the right of alienation vested in the county by the Constitution. Such an option would be nonenforceable, and would give no right or interest in and to school land. Midland County v. Slaughter, 61 Tex. Civ. App. 328, 130 S. W. 612; Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419; Tibbs v. Zirkle, 55 W. Va. 49, 46 S. E. 701, 104 Am. St. Rep. 977, 2 Ann. Cas. 421; Swift v. Erwin, 104 Ark. 459, 148 S. W. 267, Ann. Cas. 1914C, 363. In re Armory Board, 29 Misc. Rep. 174, 60 N. Y. Supp. 882; Hickok v. Still, 168 Pa. 155, 31 Atl. 1100, 47 Am. St. Rep. 880; Navigation Co. v. Sutherberry, 16 Ch. Div. 236. In some of the cases cited the party granting the option stands in the relation of trustee with power to sell. The courts generally holding a power to sell would not authorize an option.

We think the consensus of the various decisions upon the nature of an option is that it is an agreement to keep an offer open which prevents a sale for the time being. An option is not the use of the power to sell, but a surrender of it for the time, or which prevents for the time, the right of alienation. Perry v. Paschal, 103 Ga. 134, 29 S. E. 703; Benedict v. Pincus, 191 N. Y. 377, 84 N. E. 284; Patterson v. Farmington, etc., 76 Conn. 628, 57 Atl. 854; Tibbs v. Zirkle, 55 W. Va. 49, 46 S. E. 701, 104 Am. St. Rep. 977, 2 Ann. Cas. 421; Swift v. Erwin, 104 Ark. 459, 148 S. W. 267, Ann. Cas. 1914C, 363; Black v. Maddox, 104 Ga. 157, 30 S. E. 732; Hickok v. Still, 168 Pa. 155, 31 Atl. 1100, 47 Am. St. Rep. 880; Starcher Bros. v. Duty, 61 W. Va. 373, 56 S. E. 524, 9 L. R. A. (N. S.) 913, 123 Am. St. Rep. 990; Woodall v. Bruen, 76 W. Va. 193, 85 S. E. 170. It is an offer, continuing offer, with the right of election or acceptance.

We are not prepared to go to the extent contended for by appellee in this case. The fact that the option was void, as we conceive the matter, did not destroy the power of the commissioners' court to make a sale to Ferrel under the constitutional authority granted that court. If, in exercising that power, it acted fairly and in good faith, we see no just reason why the sale should not be upheld.

From the fact that the court recited in its order "under and by virtue of" an option we are not disposed to hold that it meant that by virtue of its surrender of its power it then ordered the bond for title. This evidently referred to its offer to Ferrel of the land at 75 cents per acre and his acceptance, and that under and by virtue thereof the bond for title would be executed.

The offer was not left open, but closed, by the contract. The illegal thing in the option was defeated by a sale of the land. This is conclusively shown by the contract itself. The agreement in the option to surrender the right of sale and the sale of the land are inconsistent one with the other. The term "under and by virtue of" did not refer to the illegal thing as the dominating consideration of the sale. It evidently used the words simply in a descriptive sense and referred to the instrument where the offer, the price, and the terms might be found in drafting the bond for title. The contract conclusively shows no part of the consideration for the option was taken from the price or value of the land. The contract shows that Ferrel agreed to pay the agreed value as well as the then market value of the land. This was what the common schools were entitled to, and when that fund received that sum the law as well as the contract was satisfied. It is manifest, therefore, that the option was not the dominating or controlling consideration for the sale. The provisions of the option did not provide that the consideration paid for the option should be credited on the purchase price of the land. If this had been so provided, the contention of appellee might be on stronger ground.

It was argued for the county that, when Ferrel elected to take the land, the county had parted with its right to make an offer. It had contracted it away by the option, and therefore it made no offer. The appellee also in its argument assumes:

"It is true the continuing offer of the county in the option to the optionee is void. The right of election in the option is void. The promise to convey by the county conditioned upon election is void."

It seems this proves too much for appellee's case. If all these things are true of the option contract, the powers of the court were free, and it could freely make a contract of sale. The option could not have been the dominating consideration or inducement to the sale, and the use of the terms in the order was mere surplusage that could have had no influence on the contract. Entering the order directing the execution of the bond for title and delivery thereof upon payment of the first payment, and that no commission should be charged on the sale, shows the commissioners' court was then exercising its powers of sale. This order further shows that the terms of the option contract, or at least its form, was not to be accepted, but a bond for title should be made. The contract of sale has the features of a bond for title

and also of an executory contract, but entirely different in form and in its features for the protection of the county from those in the option contract. This contract was examined by the court before its delivery for their approval. It is manifest, we think, the court was then exercising its independent powers with reference to the sale of the land, and not as a mere instrument of the option contract.

[6] The consideration for the option is a thing apart from the consideration for the sale of the land. An option contract and a contract of sale are in fact two separate and distinct contracts, viz. an option contract and the agreement to sell.

"The consideration for the two contracts are as separate and distinct as the contracts themselves." James on Option Contracts, 324, p. 141.

The option was not a sale of the land or an agreement to sell the land, and therefore the consideration paid for the option, if anything, was no consideration for the land. Ide v. Leiser, 10 Mont. 5, 24 Pac. 695, 24 Am. St. Rep. 17; Pollock v. Brookover, 60 W. Va. 75, 53 S. E. 795, 6 L. R. A. (N. S.) 403.

If the terms embodied in the option upon election for the sale of the land are not changed and placed in a separate instrument, the two contracts are nevertheless separate contracts. This is especially true where, as in this case, the sale was to be evidenced by a bond for title, and the contract for the protection of the county is entirely different from those terms provided in the option contract, and the terms are different with reference to payment. Under the option in this case the entire consideration was to be paid, while the contract executed stipulated that "any part" could be paid within 20 years; that is, it provided for partial payments. It is therefore manifest that the contract of sale was separate and severable from the option, both as to the thing sold and the consideration. Where this is true, the illegal or void contract will not defeat the legal contract executed under a power lawfully exercised.

[7, 8] The contract restraining alienation cannot, as we conceive it, enter into, form a part of, or be the basis of an alienation made under the powers conferred by the Constitution upon the commissioners' court. "In fact the rule has been stated to be that, where two promises, one of which is illegal, are made upon a lawful consideration, the promise which is unobjectionable is ordinarily held to be enforceable. * * * At all events the distinction between a contract a part of which violates a statute and a contract a part of which contravenes public policy appears no longer to be recognized. The rule with respect to contracts in violation of statute has been declared to be that, if any part of an agreement is valid, it will avail pro tanto, though another part of it may be prohibited by statute, provided the statute does not either expressly or by necessary implication render the whole void, and provided the sound part can be separated from the unsound and enforced without injustice to the defendant. The principle that the circumstance of a contract stipulation being illegal in the sense of being merely unenforceable, either by virtue of statutory provision or on account of general considerations of public policy, will not affect the validity of other stipulations in the same contract, provided they are severable from the invalid portion and capable of being construed divisibly, is incontrovertibly established, and has a wide field of application; and it makes no difference whether there are two distinct promises, whether there is one promise that is divisible, or whether the consideration for the two promises is entire or apportionable. It is perfectly well settled that, where one provision in a contract which does not constitute its main or essential feature or purpose is void for illegality or otherwise, but is clearly separable and severable from the other parts which are relied upon, such other parts are not affected by the invalid provision, and may be enforced as if no such provision had been incorporated in the contract." 6 R. C. L. Contracts, 214, p. 814.

See City of Tyler v. Jester, 97 Tex. 344, 78 S. W. 1058; Osgood v. Bauder, 75 Iowa, 550, 39 N. W. 887, 1 L. R. A. 655; Western Union Tel. Co. v. Pennsylvania Ry. Co., 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968, at page 984; Oregon Steam Nav. Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315; Nicholson v. Ellis, 110 Md. 322, 73 Atl. 17, 24 L. R. A. (N. S.) 942, 132 Am. St. Rep. 445; Rand v. Mather 11 Cush. (Mass.) 1, 59 Am. Dec. 131; Koontz v. Hannibal Savings Ins. Co., 42 Mo. 126, 97 Am. Dec. 325; Ry. Co. v. Matthews, 64 Ark. 398, 42 S. W. 902, 39 L. R. A. 467; Trenton Potteries Co. v. Oliphant, 58 N. J. Eq. 507, 43 Atl. 723, 46 L. R. A. 255, 78 Am. St. Rep. 612; Packard v. Byrd, 73 S. C. 1, 51 S. E. 678, 6 L. R. A. (N. S.) 547; Osgood v. Central Vermont Ry. Co., 77 Vt. 334, 60 Atl. 137, 70 L. R. A. 930; Water & Light Co. v. City of Waco, 27 S. W. 676; 9 Cyc. p. 569.

We think the option and contract of sale are clearly severable. When the contract of sale was entered into the option had been passed and performed its function. The sale is upon a different consideration and different terms and sells a different thing.

"There is a broad distinction between contracts which are germane to the illegal transaction, which arise from but are collateral to it, and those which carry out the original scheme." Wegner Bros. v. Biering, etc., 65 Texas at p. 511.

"A new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlaw-

ful." Armstrong v. Toler, 11 Wheat. 258, 6 L. Ed. 469; Floyd v. Patterson, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787; Russell v. Kidd, 37 Tex. Civ. App. 411, 84 S. W. 273; Edwards v. Roberts, 222 S. W. 278.

The contract of sale may have arisen from the previous option, but it was only collateral to the sale, which was a new or different contract upon a valid and different consideration.

The option and contract of sale may have related to the same property between the same parties, but the contract of sale, being on a different consideration and a contract which the commissioners' court was empowered to make under the Constitution, was valid and enforceable.

[9] The appellee assumes, apparently, that this case should be disposed of upon the theory that the appellant holds its rights on an option contract, for the reason that it recited in the contract of sale that it is in virtue of an option. It must be borne in mind appellant holds its right through a sale by the commissioners' court, the only body authorized to make it and that the contract has been fully executed, the purchase price paid, and deeds properly authorized, executed, approved, and delivered by the proper authority. It is said the giving of an option was against public policy, and therefore this tainted the whole transaction, which cannot be purged by the execution of the contract or by ratification. Courts, we think, where public policy is not settled by recognized principles, use their powers to declare a contract in contravention of public policy only in cases in which the injury to the public is clear. The presumption in doubtful cases is in favor of the validity of the transaction. Miller v. Roberts, 18 Tex. 16, 67 Am. Dec. 688; Stickney v. Hughes, 12 Wyo. 397, 75 Pac. 945; Trumpf v. Shoudy, 166 Wis. 353, 164 N. W. 454.

"The power of the court to declare a contract void as being in contravention of public policy is a very delicate and undefined power, and should be exercised only in cases free from doubt." Huber v. Culp, 46 Okl. 570, 149 Pac. 216.

Every case must in a large measure turn on its own facts. Wallace v. McPherson, 138 Tenn. 458, 197 S. W. 565, L. R. A. 1918A, 1148. Again, it is said where the lawmaking power speaks on a particular subject over which it has constitutional power to legislate, public policy in such case is what the statute enacts. U. S. v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007. The Supreme Court of the United States has said, in effect, questions of public policy affecting liability of acts done when not controlled by the Constitution, treaties, or laws of the United States, or by the principles of the commercial or mercantile law, or of general jurisprudence of national or universal application, are governed by the laws of the state as expressed in its Constitution and statutes or declared by its highest courts. Hartford Fire Insurance Co. v. Railway Co., 175 U. S. 91, 20 Sup. Ct. 33, 44 L. Ed. 91. As our Constitution and statutes have declared that an agency shall be employed in disposing of or selling school lands granted to the counties, it would seem that all that may be required would be to look to such laws and the interpretation thereof by our courts to ascertain the public policy with reference thereto. The Constitution or laws do not expressly declare an option to be illegal or forbid the commissioners' court giving one. All that may be properly said, we think, is that the power to sell does not include the power to option. It is not expressly prohibited by law, and is not itself immoral. If the commissioners' court actually made a sale in good faith and at a price which is the value of the land, we are unable to perceive how an option would taint a contract of sale fully executed or ratified. The appellee relies upon an English case, together with others, as sustaining its position assumed in this court. Oceanic Steam Navigation Co. v. Sutherberry, 16 Ch. Div. 236. In that case it was held, in effect, that an executor or administrator could not give an option of purchase at a future time to the lessee; that the option was ultra vires; that such option fettered the trust for sale, preventing the administrator from selling. In that case the heirs sued to cancel the option, as we understand the case. After quoting from the opinion in that case, in a supplemental argument, appellee, by counsel, says:

"It is necessarily true that in such case, if the property had been sold under the option and the beneficiaries had accepted the money and kept it, private interests and private parties only being involved, the sale would have been ratified."

It would seem as much against public policy for an administrator, an officer of the court, to violate his trust as for the commissioners' court to do so. If the administrator could make a deed and execute the contract, we see no reason why a commissioners' court could not do so. In fact, the only power to accept the money for school land, make a contract, execute a deed therefor, or to ratify a sale was the commissioners' court. The English court did not rest its position on public policy, but ultra vires; so the option did not or would not have tainted a sale made under the powers of the trust. The question here is simply one of power. Counsel for appellee evidently has reached that conclusion, for in the argument it is said:

"If we can afford any suggestion for the benefit of the court relative to this whole matter, we believe, as applied to a municipal corporation, that the sole question is one of power."

The contract of sale being within the general scope of the authority granted, it would not be void if the county merely in excess of its authority gave the option preceding the sale. The manner of making the sale was left with the commissioners' court by the Constitution, and, in adopting the manner of making it, it may have exceeded its power in giving an option; yet this would not necessarily render the sale illegal. As said by our Supreme Court, speaking through Judge Gaines:

"If the contract be within the general scope of the corporate authority, and the prohibition be merely against the mode of its execution, it is valid as against the corporation who has received its benefits, in favor of a party who has fully complied with the obligations on his part." Railway Co. v. Gentry, 69 Tex. 625, 8 S. W. 102.

The above rule also acts conversely. City of Corpus Christi v. Central Wharf Co., 8 Tex. Civ. App. 94, 27 S. W. 803; Bond v. Terrell Cotton & Woolen, etc., Co., 82 Tex. 309, 18 S. W. 691. In the Corpus Christi Case Judge Williams held the city could not contract to the wharf company the powers and trusts conferred on it by the Legislature, and such a contract could not be enforced, but it appears the contract had been fully executed, and, defendant having received the full benefit of the lease, it would not be allowed to free itself by setting up the want of power in the city or itself to make the contract.

"There was nothing immoral or illegal, in the sense of an infraction of the positive prohibition of law, in the action of either party. At most, their action was in excess of the powers conferred. The restrictions upon the powers of the city government are imposed by law for the protection of the inhabitants of the city and the general public. By proper proceedings, taken by the right parties in due time, all such transgressions of power may be promptly remedied. But, when such contracts had been allowed to stand until fully carried out, it does not lie in the mouth of the party who received their benefits to urge the defense of ultra vires."

If it cannot be used as a defense, surely it ought not to be used as a ground to set aside a consummated sale. The rule contended for by the appellee that, when a municipality is without power to make a contract, a contract so attempted to be made is void and cannot be ratified, is, of course, well established. The sale of school land is sought to be set aside. The Constitution placed the power of sale in the commissioners' court and no one else, giving it the power to provide the manner of sale. Now it is contended that, because the sale was made through the method or means of an option, and because the county could not give an option, the sale actually consummated is void. The appellee bases its contention on the proposition that the right to sell and dispose of the school land "in any manner provided by the commissioners' court carries with it the full discretionary power of said courts to sell or dispose of the lands in accordance with an untrammeled judgment," and the option "is an act of attempted suspension of said power." The option had the effect of fettering the power of sale. It, in the language of the proposition by appellee, interfered with the untrammeled judgment of the commissioners' court, which was suspended by the option. The proposition amounts in effect to saying for the time being that the court surrendered its discretion and left to the optionee the discretion, if you please, of concluding the sale. What more did the commissioners' court do in this case than did the city council in the Corpus Christi Case, or in the Liberty County Case, 57 Tex. Civ. App. 175, 122 S. W. 291, and others? It was said in the Corpus Christi Case:

"It [the city] could not surrender the exercise of the powers so granted it to the unrestrained control of any person, and thus abandon the discretion which it was expected at all times to employ." "Our conclusion is that the contract sued on was beyond the power of the city."

Yet in that case, because the contract was fully executed, a party receiving the benefits thereunder could not defend an action on the ground that the city had exceeded its powers. In the Liberty County Case, by the order of the commissioners' court it delegated to Perryman its powers of discretion and judgment, which alone belonged to the court. This it could not do, and in that case it is said:

"We have seen that it was within the scope of the corporate powers of Liberty county to sell its school lands, such power being expressly granted by the Constitution and laws of the state; that the invalidity of the sale did not rest upon the principle of ultra vires, but the vice lay in the manner in which the county exercised its corporate power to sell. As said in Abbott on Municipal Corporations, § 279: 'A contract may, because of some irregularity in the manner or time of its execution, be illegal because defective, and therefore incapable of enforcement. Such a contract, the authorities hold, may be ratified either by an acceptance of the contract by the public corporation * * * or by acquiescence in the existing conditions."

In this case, when the optionee elected to take the land, the county accepted his election and directed bond for title to be drawn and delivered upon making the first payment. When it directed a contract to be made, it thereby adopted at that time the agreement thus reached. It then had the power to make a sale, and, having the power of sale, it was not void for want of power. The option theretofore given did not destroy the power of sale.

[10-12] But this is not all. The interest

was regularly paid; a partial payment was made, and then a question as to the validity of the contract was raised, and the matter was then fully investigated by the court, who took the opinion of two firms of lawyers, and after this the balance of the purchase money was paid and accepted, and an order entered ratifying the transaction, ordering the deed to be made, which was executed and approved. The money received was invested in bonds and warrants, and the interest has been since continually used as part of the available school fund. Certainly this was a ratification. Gallup v. Liberty County, 57 Tex. Civ. App. 175, 122 S. W. 291; Boydston v. Rockwall County, 86 Tex. 236, 24 S. W. 272; Carter-Kelly Lumber Co. v. Angelina County, 59 Tex. Civ. App. 310, 126 S. W. 293; Brazoria County v. Padgitt, 160 S. W. 1170; Brazoria County v. Rothe, 168 S. W. 70; Waggoner v. Wise County, 17 Tex. Civ. App. 220, 43 S. W. 836; King County v. Martin, 173 S. W. 960; Comanche County v. Burks, 166 S. W. 470. In ratifying a sale the court is not ratifying an option which preceded the sale. The court in such ratification was exercising its independent judgment and discretion under the powers conferred upon it by the Constitution.

It is true the county holds school land in trust for the common schools, but 'the law or Constitution do not require a sale to be made upon the consent or approval of the beneficiaries. We are not inclined to believe those cases which rest the decision on statutes or charters requiring the consent of the stockholders to a sale or incumbrance of corporate property applicable to counties acting through the commissioners' court intra vires. It will be noted even in some of the cases, such as Westerlund et al. v. Black Bear Mining Co., 203 Fed. 599, 121 C. C. A. 627, cited by appellee, that the lease or ratification by the corporation binds that body even though it may have incumbered the land without the approval of the stockholders, while it would not estop the stockholders who had not voted to place the incumbrances on the property. It is there said:

"But a corporation which has executed and accepted the benefits of a contract within the scope of its powers—that is, neither wrong in itself nor against public policy—and that is defective only because in its execution the corporation has failed to comply with some legal requirements enacted for the sole benefit of third persons, is estopped to assail it, and the beneficiaries of the requirement alone may avoid it. Hence the stockholders of this corporation, and they alone, have the right to avoid this lease because they alone had any interest in a compliance with the legal requirement that they should assent to its execution."

The beneficiaries of the school land have no voice in its disposal; no powers are granted such beneficiaries to make, approve, adopt, or ratify the sale; those powers are confided exclusively to the commissioners' court. A sale of school land being within the scope of the powers conferred upon the commissioners'. court, though irregular in the manner of sale through first giving an option, does not make a sale fully executed void, and, if either, it was only voidable, and hence may be ratified. Aspinwall, etc., v. Aspinwall, 229 Pa. 1, 77 Atl. 1098.

"A municipal corporation may ratify the unauthorized acts and contracts of its officers which are within the scope of corporate powers, but not otherwise." 1 Dillon on Municipal Corporations, § 463.

The term "void" is frequently used in discussing contracts said to be illegal, immoral or the like in the sense of the contract being unenforceable. Hall v. Edwards (Com. App.) 222 S. W. 167. The case of Argenti v. San Francisco, 16 Cal. 255, expresses the thought in as appropriate language, as we have found:

"We readily admit that the powers of a corporation are derived solely from the act creating it, and that, as a general rule, these powers must be exercised in the particular mode pointed out by the charter. It does not follow, however, that even a want of authority is in all cases a sufficient test of the exemption of the corporation from liability in matters of contract. Of course, an executory contract, made without authority, cannot be enforced; but a different question arises where the contract has been executed, and the corporation has received the benefit of it. In such a case the law interposed and estopped, and will not permit the validity of the contract to be called in question."

In the absence of fraud or bad faith, where the power of sale is conferred, but in its exercise there is an irregularity or a mere excess of authority in the manner of making the sale, it is not void, but may be ratified, and when fully executed will not be set aside. The commissioners' court being the sole authority in whose judgment is confided the discretion of sale, when that judgment or discretion has been fairly exercised, either in making the contract or in ratifying it, after full execution, it is too late for any one to call in question the sale by inquiring into facts previously to the execution of the powers. The court is one from its organization and duties with reference to the sale of school land competent to be the depository of the trust confided to it. The persons composing it are elected for that purpose. We therefore believe after full execution, as in this case, the sale should be upheld. Commissioners' Court of Knox County v. Aspinwall, 21 How. 539, 16 L. Ed. 208; Marshall County v. Schenck, 5 Wall. 772, 18 L. Ed. 556; State v. Hughes, 79 S. W. 608; and authorities above cited. It is conclusively shown in this case the option did not defeat a sale,

and it is admitted the school fund received the market value of the land at that time. It does not occur to us that we should set aside a sale fully executed because a preceding option might have defeated a sale when it did not, or that the county might have received more for the land when it was admitted it received all it was then worth. If a subsequent commissioners' court, by its judgment, may set aside a sale made by its predecessors, under different conditions, and 10 years after the sale has been fully executed, the security of all the titles resting in the action of such courts or bodies of like nature would be destroyed and the consequences serious.

The Taber Case, 101 Tex. 250, 106 S. W. 332, holds, even though the contract may have been an option, in which Taber had the right of election, yet, when he entered into possession of the land, made improvements, paid the interest, Dallas county could "not assert that there was want of mutuality in the contract, because the performance by one party of that upon which the mutuality depended relates back and makes the contract good from the beginning." It seems to us the Supreme Court in that decision intimates that, even though the contract had been originally an option when the optionee elected to perform it, it makes an enforceable contract of sale, and that it would not be void and is such through which title could be derived, and which would divest the county thereof. This we think applicable to both the contracts of July, 1898, or the previous option mentioned therein given in 1897.

The above, we think, disposes of the case, and it will be unnecessary to consider the other assignments or propositions presented by appellant. We believe the court should have instructed a verdict for the appellant as requested. The judgment of the lower court will therefore be reversed, and here rendered that the county take nothing by its suit, and that appellant recover judgment for its costs in the court below and in this court.

HALL, J. I respectfully dissent from the majority in the disposition made of this appeal. If the contention was between individuals with relation to property owned in fee by one and purchased by the other, then I think the majority opinion is an able presentation of the law governing the rights of the parties, but, according to my view, we have no such case before us. The subject-matter of the suit is certain real estate expressly set apart to Potter county, "for the benefit of the public schools therein." Section 6, art. 7, of the Constitution of this state declares in unequivocal terms that said land is "of right the property of said" county, and in which "the title thereto is vested." This article further commands that "said lands and the proceeds thereof, when sold, shall be held by said counties as a trust for the benefit of public schools," provided that "each county may sell or dispose of its lands, in whole or in part, in manner to be provided by the commissioners' court of the county." It seems clear that the effect of this pronouncement of the Constitution is to vest the title to the land in the county as a mere trustee, and that the beneficial interest is in the public schools. Indeed, this is expressly so held by our Supreme Court in Webb County v. School Trustees, 95 Tex. 137, 65 S. W. 878. It follows that the county is the trustee, and the commissioners' court is merely the agent of the trustee, with the limited authority to provide only the "manner" in which the trust property is to be sold or disposed of by such trustee.

We have, then, a case where an attempt has been made to sell and dispose of a trust estate, not by the cestui que trustent, and not by the trustee, except in so far as such trustee has been represented by its agent, the commissioners' court. The school children of the county, the ultimate beneficiaries, could not, in the nature of things, be parties to any contract affecting the trust property. If the trustee and the beneficiaries are to be held bound by the terms of a contract, executed by an agent not of their own selection, but one imposed upon them it should be so held only after the contract has been subjected to the closest scrutiny and after a most searching investigation is made of the facts, and after the strictest application of only the rules of law and equity existing for the protection and guardianship of the sacred rights of those who are the real owners of trust property, and who are at the same time absolutely excluded from having any voice in its disposition. Many rules applicable to suits between individuals where there is no element of agency, trust, or public interest involved are foreign to this case. We know that the personnel of a commissioners' court generally, and as in this case, is a changing one; that new members are usually unfamiliar with the official acts of their predecessors; that they feel bound and generally do act in accordance with what has previously been done; and that, too, without, in many instances, a full investigation. The fact that it is sought to bind the imposed trustee and the powerless impersonal beneficiary by the proceedings of such protean body demands a jealous consideration of the issues presented and in accordance with rules of law peculiarly applicable only to such cases. In the Webb County Case, supra, and also in the case of Dallas County v. Club Land & Cattle Co., 95 Tex. 200, 66 S. W. 294, the Supreme Court draws a clear distinction between the county in its ordinary corporate capacity and as trustee of its public school

iands, saying in the last-named case that this distinction "must be kept in mind." I think the majority opinion loses sight of this important distinction. In the Delta County Case, 100 Tex. 51, 93 S. W. 419, the Supreme Court further said that public schools are institutions of the state, established as part of its general governmental policy, intrusted to the management of the commissioners' courts, as instrumentalities in executing that policy, and that suits brought to protect the trust property "are practically suits in behalf of the state." It has been frequently held that commissioners' courts do not have general authority over the business of the county, but are vested with merely such special powers as are specifically conferred by the Constitution and laws of the state; therefore those dealing with them do so with full notice and at their peril. Because this is practically a suit by the state, involving the enforcement of a contract made for those who could not, under the law and in the nature of things, have a voice in the matter, and has been made by an agent with special and limited authority, dealing with trust property in which the public is interested, I cannot agree that all the rules which apply to ordinary contracts entered into by individuals primarily interested should control in the disposition of the case. The danger in so doing is illustrated in part by the application made in the majority opinion of the rule of practical construction of contracts by parties. The effect of that rule is to make it generally controlling, and the courts will ordinarily interpret and enforce an agreement in accordance with the practical construction of the parties to it, but the rule of practical construction, like many other rules, which seem to have governed the majority in the disposition of the case, should have no effect in a controversy of this character. As said in 13 C. J. 459:

"It is obvious, that in every act of a party indicative of an understanding of a contract in accordance with the claim of the other party will be given the effect of a practical interpretation, and the effect of any particular acts must be determined from the circumstances surrounding the particular case. One who goes beyond the requirements of his contract, under circumstances of doubt, should not from that fact alone have his act given the effect of a concession."

In the first place, the public, or, in other words, the school children, the ultimate beneficiaries, have done nothing except through their imposed trustee and agents, which brings this case within that rule. The real parties in interest have not and could not act. It is difficult to conceive of a case where acts by a trustee, and ordinarily tantamount to a practical construction, could be held to bind the beneficiary, because the trustee is not the real party to the contract.

The rule, so far as I have been able to ascertain, has never been applied except where the conduct which would make it applicable is that of the real parties to the contract. It is said in 13 C. J. 550:

"Where public interests are affected by a contract, the construction placed on it by the parties is not controlling."

The text is supported by reference to the case of Chesapeake, etc., Ry. Co. v. Peed, 155 Ky. 696, 160 S. W. 472; Ann. Cas. 1915C, 460. In that case it is shown that a contract was entered into between two railroads, which prohibited one of them from doing any local passenger or freight business between certain points. The court said:

"It may be conceded that the parties to this contract have given it the construction claimed by counsel, and in a controversy between the parties as to the proper interpretation of the contract this contemporaneous construction of the parties would undoubtedly be entitled to great weight. Nor do we doubt that the parties to this contract are at liberty, as between themselves, to interpret it as they please, so long as their interpretation does not affect the rights of the public. But here we are dealing with a member of the public whose interests are affected by this contract, and the construction given it by the parties is not controlling on him. The public is concerned in the construction of this contract as well as the parties to it, and no construction should unnecessarily be given to it that will interfere with the duties that these carriers and each of them owe to the public."

I heartily concur in that opinion.

The general rule is that a trustee with power to sell has no authority to grant an option. Mansfield v. Wardlow, 91 S. W. 859; In re Armory Board, 29 Misc. Rep. 174, 60 N. Y. Supp. 882; Hickok v. Still, 168 Pa. 155, 31 Atl. 1100, 47 Am. St. Rep. 880. In Midland County v. Slaughter, 61 Tex. Civ. App. 328, 130 S. W. 612, it is held that a lease of 20 years, coupled with an option to purchase the leased premises, was unreasonable and void. A writ of error was refused. Justice Gaines, in Dallas County v. Club Land & Cattle Company, 95 Tex. 200, 66 S. W. 296, said:

"In Pulliam v. Runnells Co., * * * it is, in effect, held that the commissioners' court was not authorized to dispose of the lands otherwise than by sale or lease."

The option contract in question recites a sufficient consideration, and, if given effect, would prevent Potter county from selling or otherwise legally disposing of its lands for a term of 5 years to any one save the optionee and for a greater price or upon different terms than 75 cents per acre, payable in 20 years. This would be an unwarranted restriction upon, and a complete surrender and destructive of, the constitutional right of the county during the term of the option

to sell to any one for a better price, and is therefore illegal.

"Agreements in violation of positive law are those which are expressly or impliedly prohibited, either by some rule of the common law or by some express statutory provision. * * * As a general rule, all contracts or agreements which involve or have for their object a violation of the law are illegal. It is immaterial, as far as the effect of the illegality is concerned, whether the object of the agreement is forbidden by the common law or by statute, or, generally speaking, whether the thing forbidden is malum in se or malum prohibitum,"· etc. 13 C. J. 411, § 341.

"Agreements the object or tendency of which is to constitute a fraud or breach of trust or breach of duty on the part of one who stands in a fiduciary or confidential relation are illegal and void, as constituting or tending to constitute a fraud on third persons. While it is often said that such agreements are against public policy, because it is the policy of the law to secure fidelity in the discharge of their duties by all persons holding such positions of trust and confidence, yet it is more accurate to say that such agreements tending to cause unfaithful conduct by fiduciaries are illegal because they are in effect agreements to wrong or to defraud persons whose interests the fiduciaries have in charge."

Bearing in mind the distinction between the county in its ordinary corporate capacity and as trustee for the benefit of the public schools, and the fact that it was its bounden duty as trustee, with power to sell, to obtain the very best price and hold itself free at all times to accept any offer to that end, it seems to me that the option by which the commissioners' court tied the hands of the trustee for five years, thus paralyzing it during that period in the exercise of its constitutional right and duty, should be held void upon the ground of public policy as well. In determining the question of public policy, courts look to the tendency of the contract to harm the public rather than to the actual results.

"If an agreement binds the parties or either of them to do, or if the consideration is to do, something opposed to the public policy of the state or nation, it is illegal and absolutely void, however solemnly made. It is not easy to give a precise definition of public policy; it is perhaps correct to say that public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against public good, which may be designated, as it sometimes has been, the policy of the law or public policy in relation to the administration of the law. Where a contract belongs to this class, it will be declared void, although in the particular instance no injury to the public may have resulted; in other words, its validity is determined by the general tendency at the time it is made, and, if this is opposed to the interests of the public, it will be invalid, even though the intent of the parties was good, and no injury to the public would result in the par-

ticular case. The test is the evil tendency of the contract, and not its actual injury to the public in a particular instance." 13 C. J. 424, § 360.

It is said that the source of the public policy of a state is its Constitutions, laws, and judicial decisions. Id. § 362. Quoting the text further, we find:

"If by well-settled judicial precedent the law has determined that contracts of a certain class tend to the injury of the public or are inconsistent with sound morality, the court should follow the law thus declared without regard to its own notions of the tendency of the contract, and, even in the absence of precedent, the court may declare a contract void when contrary to the established principles of the law. Many agreements, therefore, which have already been discussed as void, because contrary to the terms of the statute, are also void as being contrary to the policy of the law as expressed in those statutes. But there are many things which the law does not expressly prohibit or penalize, which are so mischievous in their nature and tendency that on grounds of public policy they are not permitted to be the subject of an enforceable agreement."

"Agreements not to compete with another in making bids, to withdraw a bid for a public quasi public contract, to share in the result of profits, or other agreements having a direct tendency to prevent bidding or competition are against public policy." Id. 436, § 371.

I think the contract in the instant case is within this rule, and its vice is more apparent when it is shown that the land was conveyed by deed for 75 cents per acre at a time when its actual market value was $2 per acre. I cannot, therefore, avoid the conclusion that the trustee, the county, through its agent, the commissioners' court, has exceeded its powers as limited and defined by the Constitution, resulting in a contract against public policy. The option feature of this case distinguishes it from the cases of Tabor v. State, 38 Tex. Civ. App. 235, 85 S. W. 835, and Taber v. Dallas County, 101 Tex. 241, 106 S. W. 332, relied upon in part by the majority in sustaining their holding. The contract "under and by virtue of which" appellant acquired the land is evidenced by the several orders of the various commissioners' courts, the option contract of November 8, 1897, the bond for title, the deed and obligation of Ferrel and his assignees, the appellants, and by reference and cross-reference in most of these instruments the option feature is incorporated, and in my opinion is unquestionably made the impelling consideration and inducement from time to time, leading up to the final consummation of the transaction. Every step taken after the commissioners' court granted the option, and after the execution of the formal written option contract in obedience to such orders, harks back to the option, and the attempt of the majority to divorce the bond for title and the final conveyance from its

contaminating influence ignores the fact apparent upon the face of the record that the parties regarded the option as the very basis of all their subsequent negotiations and the ground of their respective rights and obligations as well as the inducement for further and final action. I think that the divorcement by the majority of the option from the subsequent proceedings also does violence to the universal rule that all the writings relating to the subject-matter of a contract enter into and are parts of the whole, and together must be looked to and construed as constituting the entire agreement between the parties. I cannot agree that this is a severable contract, because there is only one common intent and purpose in view, viz. the ultimate sale of the land. To this end there is only one covenant on either side. The county covenants to sell the entire tract of land upon payment according to the requirements of the contract at the election of the purchaser if exercised within five years. If this covenant is valid, the purchaser by tendering performance within the time, might have demanded a conveyance. On the other side, the purchaser's covenant is to pay according to the agreed terms. In 4 Page on the Law of Contracts, § 2083, the author, in discussing entire and severable contracts, says:

"If a contract contains two or more covenants on either side, the question arises as to whether it is entire or severable. An entire contract is one the covenants of which have not been separated by the parties, and which accordingly cannot be separated by the court. It is also said to be a contract in which the parties intend that each covenant shall be connected with and relate to every other covenant. It is also said that an entire contract is one in which there is an entire consideration on each side. * * * Such a contract is sometimes called an indivisible contract. If a contract which contains two or more covenants on one side is regarded by the parties as really consisting of two or more separate contracts, the contract is said to be severable. It is said that, if the consideration is single the contract is indivisible and entire. This last statement, however, is rather a test for ascertaining the true intention of the parties than a test for determining the legal effect of the contract when the intention is ascertained."

The subsequent execution of the contract of sale and the final conveyance on the one side, and the agreement to pay and the final payment on the other, are but the consummation of the original void covenant. The promise to convey, upon the one part, and the promise to pay, upon the other, are the considerations moving from the respective parties for their mutual promises. Neither consideration is divisible. The contract to convey and the deed are not new contracts, but were executed to carry out the original illegal intents as expressed in the option.

But, if it should be admitted that they are different contracts, the rule is that—

"Where a contract grows immediately out of and is connected with a prior illegal contract the illegality of such prior contract will enter into the new contract and render it illegal. And the rule has been particularly laid down that if the connection between the original illegal contract and the new contract can be traced, and that if the latter is connected with and grows out of the former, no matter how many times and in how many different forms it may be renewed, it cannot form the basis of a recovery. So every new agreement in furtherance of or for the purpose of carrying into effect any of the unexecuted provisions of the previous illegal agreement is likewise illegal and void, as is a contract the performance of which depends on performance of a prior invalid contract." 13 C. J. 509, § 460.

To the same effect is 6 R. C. L. 820, § 260:

"If a contract grows immediately out of or is connected with an illegal or immoral act or contract, a court cannot lend its aid to enforce it, though it is in effect a new contract. If the connection between an original illegal transaction and a new promise can be traced, if the latter is connected with and grows out of the former, no matter how many times it may be renewed, it cannot form a basis of a recovery. Repeating a void promise cannot give it validity. * * * These are absolutely void because they have no legal sanction and establish no legitimate bond or relation between the parties."

Appellant paid the same price they had agreed to pay in the option contract. But suppose that the option is one consideration for appellant's agreement to pay and that the contract of sale is another, a new consideration; still the consideration moving from appellants cannot be divided or apportioned, and, if this cannot be done, the contract is, entire, and not severable. In the case of Edwards County v. Jennings, 89 Tex. 618, 35 S. W. 1053, the county entered into a contract with appellee whereby he was to construct certain waterworks, agreeing as the consideration to pay him $3,500 and grant him an exclusive right of way to lay pipes through the town of Rock Springs. In the course of the opinion the court said:

"We are of the opinion that the agreement of the county to grant Jennings 'an exclusive right of way to lay pipe for supplying the town of Rock Springs, Edwards county, * * * with water,' tends to create a monopoly, is violative of the Constitution, illegal, and void. As stated above, the consideration for the obligations imposed upon Jennings by said contract consisted of the obligation of the county (1) to pay $3,500 and (2) to perform this unlawful agreement. We cannot say which of these considerations most affected the mind of Jennings, and induced his promise; nor are there any means of ascertaining how much of his obligation was based upon the illegal consideration. The rule is well settled, upon principle and authority, that a promise made upon

several considerations, one of which is unlawful, no matter whether the illegality be at common law or by statute, is void."

See McNeese v. Carver, 40 Tex. Civ. App. 129, 89 S. W. 430; Sabine Tram Co. v. Bancroft, 16 Tex. Civ. App. 170, 40 S. W. 837.

If any part of a single consideration for one or more promises is, illegal, or if there are several considerations for one promise, some of which are legal and others illegal, the promise is wholly void, as it is impossible to say which part or which one of the considerations induced the promise. If A. sells property to B. with an option of purchase, it is an entire contract, whether the agreement is evidence by one or several instruments. Miller v. Yturria, 69 Tex. 549, 7 S. W. 206; Hall v. Jennings, 104 S. W. 489; Boatright v. Peck, 33 Tex. 68. We must therefore consider together the order of November 8, 1897, entered in the minute book of the commissioners' court, volume 2, p. 153, granting Ferrel, for a term of five years, an exclusive option to purchase the land for 75 cents per acre, "provided that said Ferrel fully complies with the terms and conditions of his said lease * * * during the grant of option of sale." On the same day Judge Marrs, in compliance with that order, and expressly referring to it in the instrument, executed and delivered the written option contract reciting in part that the grantors—

"do by these presents sell this option to the said R. S. Ferrel, the same being upon the following terms and conditions, to wit: For and in consideration of the sum of one dollar cash in hand, the receipt of which is hereby acknowledged, and the further consideration of the sum of seventy-five cents per acre," etc.

This instrument provides that the option shall be void upon the failure of Ferrel to exercise it within the time limit. Thereafter, on July 1, 1898, the court ordered Judge Marrs to deliver a bond for title to Ferrel, the order reciting:

"Under and by virtue of an option of purchase said Ferrel has with Potter county, Texas, under order of this court, said order being on record on page 153, Book 2."

On July 25, 1898, Judge Marrs executed and delivered to Ferrel a bond for title or contract of sale set out in full in the majority opinion, and this instrument incorporates the order made by the commissioners' court and entered on the minutes thereof in volume 2, p. 153, which granted the option. I am not convinced that the Supreme Court's action in refusing a writ of error in the first Tabor Case, supra, and their decision in the second case, may be taken as a holding that the contract therein discussed was not an option by admitting that such is the holding in those cases; nevertheless, since it is recited in the contract here being considered

that it is executed "under and by virtue of" the option agreement, the conclusion is inevitable that it is void if the option is void. "By virtue of" means by or through authority of. "Under" has the same signification and is also defined "in subordination to" and "in conformity with." Bassett v. Mills, 89 Tex. 162, 34 S. W. 93. The bond for title was executed because the optionee had exercised an illegal and void power of election claimed by him under the option. In its absence he could not have demanded that the land be sold to him at 75 cents per acre on 20 years' time. Suppose he had sued the county to enforce specific performance of the option contract; I think the county could have successfully defended upon the grounds that the commissioners' court had exceeded its powers under the Constitution, and had made a contract void as against public policy. If this be true, under the authorities above quoted, the transaction cannot be purged of its illegality nor vitalized by doing voluntarily, under and by virtue of the void option, a thing which as a matter of law it could not be forced to do. Entering into the contract of sale is not a ratification, even if this contract would be ratified, and I insist that it cannot. As said in 6 R. C. L. 820, § 216, in discussing the enforceability of promises growing out of illegal contracts:

"These are absolutely void because they have no legal sanction and establish no legitimate bond or relation between the parties. When the contract is in substance or in essential form illegal, neither party can ratify it, because the wrong done is against the state. The state only can forgive it. To permit the subsequent ratification of such contract or to consider it the sufficient and legal basis of a subsequent promise would be a manifest inconsistency. It would be to annul the rule and enable the parties by an easy expedient to evade laws based upon considerations of public policy."

As insisted by appellee, if the ground of the option is void, then the right of election is void, and the exercise of the right of election, together with the execution of the bond in compliance therewith, can neither create a new contract nor give rise to legal rights under it. Suppose the optionee had waited until the last day of his five-year term and when the land had enhanced materially in value before electing to purchase; could it be contended that compliance then was not against public policy? If a void option for five years can be validated by an election just before the expiration of the period, then one for twenty years would be equally valid. If it is unlawful to make an executory contract, it is unlawful to carry it out.

Notwithstanding the persuasive opinion of the majority, which seems to be supported at least in part by authority, which this writer respects, I am strongly inclined to the

opinion that as to Ferrel the bond for title or contract of sale, as it is variously called in the briefs, imposes no actionable obligation upon him in the event he should refuse to comply with its terms. That instrument contains this provision:

"And it is specially provided that, should the party of the second part or his legal heirs or assigns fail or refuse for sixty (60) days after any one semiannual interest payment becomes due to pay the same, then this obligation becomes null and void and of no binding force and effect on either party hereto."

This paragraph of the instrument further provides for the forfeiture of all improvements to the county, binds Ferrel to quit and surrender the premises, and authorizes the county to re-enter and take possession thereof, "and to hold as in her former estate, and thereupon this contract of sale and everything herein contained shall cease and be null and void, and all claims for damages by reason of such entry being hereby expressly waived, and the party of the first part shall have no rights hereunder for a specific performance hereof." I cannot avoid the conclusion that this stipulation is self-executing. By merely refusing to pay any semiannual installment of interest, then ipso facto the obligation becomes null and void and of no binding force or effect on either party. Unless this term is abrogated the contract must be an option. For the courts to ignore it is in effect making a contract for the parties other than the one executed and delivered by them. James on Option Contracts, § 105, says:

"An agreement of sale is a contract by which the seller agrees to sell and the buyer agrees to purchase the property in a thing for a price in money. The distinction, therefore, between a sale or an agreement of sale, on the one hand, and an option contract, on the other, is very apparent. An option does not bind the optionee to purchase the property; an agreement of sale does. The thing directly contracted for in an agreement of sale is the property. In an option contract it is the right of election to purchase the property. It may be laid down as an established rule of law that, unless the contract contains language which may reasonably be construed as an agreement on the part of the vendee to purchase the property, or to assume some obligation thereunder, it will be held to be an option contract, and not an agreement of sale and purchase. It is impossible to conceive of an agreement of sale and purchase without obligations on the part of the vendee; on the other hand, the absence of such obligation is the distinctive characteristic of an option contract. A contract of sale creates mutual obligations on the part of the seller to sell and on the part of the purchaser to buy, while an option gives the right to purchase within a limited time without imposing any obligation to purchase."

In appellee's brief I have found an illuminating discussion of a number of cases which

in my opinion announce the rule applicable to this particular feature of the controversy, but which, for the sake of brevity, I will not undertake to reproduce here, because in my opinion the contract of sale clearly does not bind Ferrel to even pay the interest semiannually. It does specifically provide however, that his failure or refusal to do so puts an end to every conceivable obligation in it, and by way of further emphasis of its finality, with great detail, adjusts the rights of the parties after the contract is at an end.

It is my opinion further that the rules of acquiescence, estoppel, and ratification should not be applied as against the beneficiaries for the same reason that the rule of practical construction is inapplicable. It will be remembered that, after the administration of the county's affairs passed into the hands of Judge Merrill and a different commissioners' court, it was so apparent to them that the proposed sale of the land was such a sacrifice of the interest of the beneficiaries that the matter of repudiating the whole transaction was referred to two different firms of attorneys. The doctrines of acquiescence, ratification, and estoppel do not and should not apply in a case of this kind. Where a person with actual knowledge of all the facts has induced another to believe that he acquiesced in or ratifies a transaction, or that he will offer no opposition thereto, and the other, in reliance upon such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice, and may be held to have acquiesced in or to have ratified the act of his agent in making such contract. Acquiescence and ratification must be founded upon knowledge and assent. How could the beneficiaries in this case be held to assent to acts which they were powerless to prevent? This is trust property. No affirmative conduct on the part of the beneficiaries is or could be charged, and the rule is declared "that mere silence and noninterference by the cestui que trust before his interest has come into possession do not bind him as acquiescing in a breach of the trust." It is said in 13 C. J. 506, § 452, "A contract malum in se or against public policy cannot be made valid by ratification," and (Id. § 453) the same rule obtains as to estoppel, and further (Id. § 448):

"Where a person seeking relief from an illegal contract was not sui juris, and therefore did not have legal capacity to enter into the contract, the illegality of the contract will not prevent the courts from granting relief to him to recover property parted with by him in execution of the contract."

Quoting from Ann. Cas. 1914C, 742, note to Walker v. Milliken, this is declared to be the law:

"In order to bind a cestui que trust by acquiescence in a breach of trust by the trustee,

it must appear that the cestui que trust knew all the facts and was apprised of his legal rights and was under no disability to assert them. Such proof must be full and satisfactory. The cestui que trust must be shown in such case to have acted freely, liberally, and advisedly, with the intention of confirming a transaction which he knew or might or ought with reasonable and proper diligence to have known to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him or if a free disclosure is not made to him of every circumstance which it is material for him to know. He cannot be held to have recognized the validity of a particular investment unless the question as to such validity appears to have come before him. The trustee setting up the acquiescence of the cestui que trust must prove such acquiescence. The trustee must also see to it that all cestuis que trust concur in order to protect him from a breach of the trust. If any of the beneficiaries are not sui juris, they will not be bound by acts charged against them as acts of acquiescence."

The utter impossibility of ratifying an illegal and void contract or of either party thereto being estopped is so convincingly set out in 2 Page on the Law of Contracts, §§ 1038 and 1039, and the text is sustained by such wealth of decisions, that I deem it sufficient to refer to it and the following Texas cases in support of my position: Commonwealth Bonding & Casualty Insurance Co. v. Curry, 183 S. W. 1; State National Bank v. Fink, 24 S. W. 939; Rue v. Railway Company, 74 Tex. 474, 8 S. W. 533, 15 Am. St. Rep. 852.

If I am correct in my opinion that the option contract was not only ultra vires, but was also violative of the law and Constitution, and against public policy, then neither the execution of the contract of sale "under and by virtue" thereof nor the receipt of the interest and purchase money, nor the execution of the deed by the trustee, can be held to be a ratification or work an estoppel against the beneficiary. All of these acts are merely factors, calling into action the equitable powers of the courts, and to be considered in adjusting the equities of the parties relative to reinvesting title in the county, refunding payments less reasonable rents, etc., because, as declared in 13 C. J. 497, § 440:

"The ordinary rules governing individuals that when a contract against public policy is executed the law will leave the parties where it finds them does not apply where the public is one of the parties."

The principle of pari delicto does not preclude the granting of relief to the complaining party in cases where it is sought to have it applied against trustees and other fiduciaries and where the public welfare is involved. 2 Elliott, §§ 1103 and 1104. Gallup v. Liberty County, 57 Tex. Civ. App. 175, 122 S. W. 291, is not, in my opinion, authority upon any issue in this case. There the commissioners' court merely exceeded its powers in the manner adopted by it in selling, through the county judge as agent, and agreeing to pay him a commission. This is characteristic of several of the cases cited in the majority opinion. As agent, the county judge made a contract, unobjectionable by reason of the option feature, or otherwise, with the purchasers, which in itself could not be challenged upon the ground of public policy or the violation of a legal inhibition. The trouble in that case was in its contract with the county judge, and in delegating their authority to him the commissioners' court acted, as stated by the Court of Civil Appeals, ultra vires. An ultra vires contract is not wholly void. Railway v. Gentry, 69 Tex. 625, 8 S. W. 102. In the instant case the contract with the purchaser himself is not only ultra vires, but in my opinion is wholly void upon the ground above stated. The distinction between that case and this is clearly defined in the language of Judge Neil as follows:

"If there is legal authority for the contract, though it be illegal because of some irregularity or informality in the manner or time of its execution, and therefore incapable of enforcement, it may be ratified by an acceptance of the benefits of the contract by the corporation; but, if there be no legal authority for the contract, that authority cannot be created through the application of any doctrine or principle of estoppel, acquiescence, or ratification." 57 Tex. Civ. App. 175, 122 S. W. 296, column 2.

King County v. Martin, 173 S. W. 960, cited with others by the majority, was a suit to set aside the sale of the county school lands because of the alleged fraud of the purchaser. It appears that the county received full value for the property, and the court said, because the commissioners had the power to make the sale at that price, and because fraud did not ipso facto invalidate it, the county could ratify it. In the instant case the granting of the option is ipso facto void, or, as stated by Neil, there is no legal authority for such a contract, and the commissioners' court had no authority to make it or to consummate a sale growing out of it, because the tendency of an option is to result in a sale for less than the value of the land at the time of the election by the optionee. It would needlessly prolong this opinion to review all the cases cited to sustain the view of the majority upon the issues of ratification and estoppel, but a careful review of them convinces me that in those cases where the doctrines are applied the ratification has been of contracts voidable as contradistinguished from void and of acts informal and ultra vires rather than contrary to statutory provision, Constitution of the state and public policy. I have no quarrel with the holding in City of Corpus Christi v. Central Wharf Co., 8 Tex. Civ. App.

94, 27 S. W. 803, or in Bond v. Terrell Cotton & Woolen, etc., Co., 82 Tex. 309, 18 S. W. 691, and that line of cases, to the effect that parties who have enjoyed the benefits of ultra vires contracts with municipalities are estopped to set up the illegality of such contracts in suits to recover the amounts due under them. But, in my judgment, the rule does not work conversely to this, as above shown. All of these cases are conclusive authority in controversies between individuals. But, this being a case involving trust property, in which the public, as beneficiary, is primarily interested, I cannot assent to the application of the rules to the issues presented.

I therefore dissent.